**Louis PUNTOLILLO**

v.

**NEW HAMPSHIRE RACING COMMISSION and New Hampshire Trotting and Breeding Association, Inc.**

**Civ. A. No. 74-38.**

United States District Court,
D. New Hampshire.

May 17, 1974.

James J. Barry, Jr., Malloy & Sullivan, Manchester, N. H., for plaintiff.

John L. Ahlgren, Concord, N. H., for New Hampshire Racing Comm'n.

Robert A. Wells, McLane, Graf, Greene & Brown, Manchester, N. H., for New Hampshire Trotting and Breeding Assn.

## OPINION

BOWNES, District Judge.

Plaintiff is a driver-trainer of harness horses. Defendants are the New Hampshire Racing Commission (hereinafter NHRC), the regulatory agency which is responsible for horse racing activity in New Hampshire, and the New Hampshire Trotting and Breeding Association, Inc. (hereinafter TBA), which conducts the harness racing activities at Rockingham Park, Salem, New Hampshire. Plaintiff claims that in 1971 and 1972 defendants unlawfully interfered with his employment opportunities by discriminating against him because of his Italian national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Since he claims violations of 42 U.S.C. § 2000e–2, plaintiff has brought his claim pursuant to 42 U.S.C. § 2000e–5(f)(1). Jurisdiction is based on 42 U.S.C. § 2000e–5(f)(3).

Defendants have brought motions to dismiss for failure to state a claim upon which relief can be granted. It is defendant's contention that, even if they have discriminated against plaintiff in the manner alleged, Title VII of the Civil Rights Act is not the appropriate mechanism for redress.[1] This contention is based on the lack of an employment relationship between plaintiff and the defendants, a condition which defendants maintain is prerequisite to their liability under Title VII.

Defendants also contend that, since plaintiff did not formally file a Charge of Discrimination for alleged discriminatory acts in 1972, this court lacks jurisdiction over the 1972 claim.

Therefore, the two issues before me at this time are (1) whether there is an employment relationship between plaintiff and the defendants within the meaning of Title VII and (2) whether plaintiff's failure to file a formal complaint covering the discriminatory actions alleged for 1972 precludes him from seeking redress for those actions in this court.

## A. THE FACTS [2]

The relationship between driver-trainers and the NHRC and TBA does not involve the normal incidents of a typical employment relationship. In the traditional sense, driver-trainers are employed by the harness horse owners. The owners hire and fire and pay [3] the driver-trainers and, as a practical matter, stand in the shoes of an employer vis-a-vis the driver-trainers.

On the other hand, even though defendants do not assert direct control over the day-to-day actions of the driver-trainers, the racing industry is such that the NHRC and TBA have control over the ability of a driver-trainer to race, i. e., earn a living, at Rockingham that is coequal with that of the race horse owners. The TBA, through its employee, the Secretary of Racing, controls and assigns stall space at Rockingham Park, see Defendants' Exhibit 1; and the NHRC grants the licenses necessary for harness horse racing at Rockingham.[4] It is the alleged discriminatory denial of stall space and a license to race of which plaintiff complains in this action.

1. See 42 U.S.C. § 1983.

2. Testimony at the hearing was sparse. The only witness to testify was Mr. Raymond L. Porier, Director of Operations for the New Hampshire Trotting and Breeding Association.

3. Although driver-trainers' earnings normally derive from both daily fees and a percentage

of the purse, most of their earnings comes from their daily fees. Testimony of Porier.

4. Defendants, of course, operate the raceway and have jurisdiction over all facets of harness racing, including, inter alia, maintenance of the track, parimutuel betting, publicity, judging, and the settlement of disputes.

The right to use stall space can be critical to a driver-trainer. Stall space is provided without charge to those who qualify.[5] By stabling horses at the race track, the cost of private stabling and "shipping-in" can be avoided. Although these costs are generally borne by the race horse owner, and even though a number [6] of owners prefer private stabling, a driver-trainer's failure to obtain stall space can effectively curtail his opportunity to race at Rockingham. The availability of race track stall space in stables at nearby race tracks in Maine and/or Massachusetts is speculative and does not reach the problem of "shipping-in" costs. More importantly, such availability is immaterial if defendants are, in fact, illegally discriminating against plaintiff.

Even more critical to driver-trainers than stall space is the procurement of a license to race at Rockingham. The reason is self-evident. Plaintiff claims that the NHRC, which issues licenses, also unlawfully discriminated against him. In this regard, the essence of plaintiff's complaint is that maintenance of stall space is a prerequisite to obtaining a license. Porier's testimony establishes, and I find, that this is not the case. Indeed, if maintenance of stall space were a prerequisite to racing at Rockingham, no "ship-ins" would be allowed to race.[7] However, stall space is limited, and applications exceed stall space by a margin of roughly two to one. Testimony of Porier; *see* Exhibit A attached to Answer of TBA. For this reason, stall space is granted to those horses that, in the opinion of the Secretary of Racing, will best promote competition at Rockingham. In other words, the best quality horses get stall space. Testimony of Porier; *see* Defendants' Exhibit 1. Since I assume that licenses are also granted on the same standard, and since application for stall space is usually made before application for a license, I cannot rule as a matter of law that there is no connection between the grant of stall space and the grant of a license.[8]

## B. THE LAW

The first issue for consideration is whether the relationship between driver-trainers and the defendants is one contemplated by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Admittedly, the relationship here is not the traditional one. Nonetheless, the statutory language is broad.

It shall be an unlawful practice for an employer—

> (1) . . . to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's . . . national origin.

42 U.S.C. § 2000e–2(a)(1).

Throughout the Act and the applicable federal regulations, an intent to deal with more than the conventional employer-employee situation is indicated. This intent is demonstrated by the specific prohibition against discrimination by employment agencies and labor organizations, and by the prohibition of discrimination against *individuals* (as opposed to employees who are defined as "individual[s] employed by an employer.") *See generally* Sibley Memorial Hospital v. Wilson, 488 F.2d 1338, 1341–1342 (D.C.Cir. 1970); and *see* 29 C.F.R. § 1600 et seq. Congress' concern with the "prevalence of discriminatory employment practices" and its desire to deal with the problem in an effective and thorough manner is further supported by the legislative history surrounding the Civil Rights Act of 1964 and the Equal Employment Act of 1972. 1964 U.S.Code Cong. and Admin.News

---

5. *See* text accompanying note 8 *infra*.

6. Porier testified that in any given race a 20% "ship-in" rate was not uncommon. These horses come from surrounding race tracks as well as private stables.

7. *See* note 6 supra.

8. *See* note 5 *supra*.

p. 2355; 1972 U.S.Code Cong. and Admin.News p. 2137.

More specifically, the Act is aimed at providing equal employment opportunities. Its purpose is to "achieve *equality of employment opportunities* and remove barriers that have operated in the past" in a discriminatory fashion. Griggs v. Duke Power Co., 401 U.S. 424, 429–430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) [Emphasis added.]

> To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited. *Sibley, supra,* 488 F.2d at 1341.

The courts have consistently recognized that "Title VII of the Civil Rights Act of 1964 should not be construed narrowly." Tipler v. E. I. duPont deNemours and Co., 443 F.2d 125 (6th Cir. 1971); *see* Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970), and Parmer v. National Cash Register Co., 346 F.Supp. 1043 (S.D.Ohio 1972); *cf.* Culpepper v. Reynolds Metals Co., 421 F.2d 888 (5th Cir. 1970), and Georgia Power Co. v. Equal Employment Opportunities Commission, 412 F.2d 462 (5th Cir. 1969).

Like the court in *Sibley*, which considered the very question in issue here,[9] I am impressed with the fact that

the Act has addressed itself directly to the problems of interference with the direct employment relationship by labor unions and employment agencies —institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. 488 F.2d at 1342. Moreover, the 1972 amendments to Title VII clearly indicate an intent to "include State and local governments, governmental agencies and policical subdivisions within the definition of an 'employer' under Title VII." 1972 U.S.Code Cong. and Admin.News pp. 2137, 2152.

■ Defendants here are certainly employers within the meaning of 42 U. S.C. § 2000e(b); and they certainly "control . . . access to [plaintiff's] job market." *Sibley, supra,* 488 F.2d at 1341. Plaintiff has alleged discriminatory actions which fall within the purview of 42 U.S.C. § 2000e–2(a), and I cannot say that these alleged actions fall completely without the scope of activities sought to be prohibited by Title VII. *Sibley, supra,* 488 F.2d at 1342.

It should also be noted that, since the Equal Employment Opportunities Commission Determination reached the merits of plaintiff's complaint, the District Office must have thought that the relationship between plaintiff and defendants showed sufficient indicia of employment to bring plaintiff's claim within the Commission's jurisdiction.

■ Defendants' final point is that plaintiff's failure to file a formal

---

9. *Sibley* involved a claim of sex discrimination by a male private duty nurse against a private hospital. Patients at Sibley Memorial Hospital channel their requests for private duty nurses through the Hospital's Nursing Office. The Nursing Office then refers the requests to a nearby registry. Plaintiff claimed that supervisory nurses at the Hospital "themselves rejected him because he [was] a male and the requesting patients were female," 488 F.2d at 1339, and that the supervisory nurses prevented him from reporting to the requesting patients. Although the requesting patients had the right to reject plaintiff, it appeared that

to prevent invidious discrimination, "[s]uch nurses as are rejected by patients for discriminatory reasons must be paid by the patient for one day's service." 488 F.2d at 1339. The defendant-Hospital moved to dismiss plaintiff's claim of sex discrimination under 42 U.S.C. § 2000e et seq. on the grounds that the complaint did not allege the employer-employee relationship necessary to come within the statute. The Court of Appeals held that, although the district court had erred in granting a *sua sponte* summary judgment for plaintiff, the relationship was sufficient to bring the case within the contours of Title VII.

Charge of Discrimination covering the alleged discriminatory acts in 1972 deprives this court of jurisdiction over the 1972 claim. This contention has no merit in a Title VII action. *See Tipler, supra; Parham, supra; Culpepper, supra; Georgia Power Co., supra.* This is particularly true "at the motion to dismiss stage of a suit." *Parmer, supra,* 346 F. Supp. at 1046. Plaintiff's counsel has represented that in 1972 plaintiff did, in fact, apply for and was denied stall space and a license. Moreover, plaintiff contends that the Equal Employment Opportunities Commission has treated his claim as a claim of continuing discrimination. Since the case will be tried anyway, it would be inappropriate to dismiss the 1972 claim at this time.

Defendants' motions to dismiss are denied.

So ordered.