Barrie NAISMITH et al.

v.

The PROFESSIONAL GOLFERS ASSOCIATION et al.

Civ. A. No. C78–818A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Oct. 11, 1979.
On Discovery Nov. 9, 1979.

R. Lawrence Ashe, Jr., and Everette L. Doffermyre, Kilpatrick & Cody, Emmet J. Bondurant, Atlanta, Ga., for plaintiffs.

Marshall M. Criser, Gunster, Yoakley, Criser, Stewart & Hersey, Palm Beach, Fla., Frank C. Jones and Charles M. Shaffer, Jr., King & Spalding, Atlanta, Ga., for defendants.

## ORDER OF COURT

MOYE, Chief Judge.

This Title VII case is presently before the Court on four motions: (1) the motion of plaintiff Naismith to amend her complaint, (2) the motion of defendants PGA and Georgia Section to dismiss for lack of subject matter jurisdiction, (3) the separate motion of PGA to dismiss plaintiff's "playing events" claims on the grounds that those claims are barred by agreement of the parties, and (4) the motion of PGA for a protective order prohibiting discovery against PGA with regard to any "playing events" question.

Plaintiff Barrie Naismith brought this action on behalf of herself and other female professional golfers and would-be professional golfers alleging that employment discrimination by defendants had injured plaintiffs. Most of the case has been settled under a consent decree entered by the Court on April 2, 1979. When plaintiff began discovery with respect to the so called "playing events" claims, defendants filed the motions mentioned earlier.

### I. MOTION TO AMEND.

When the defendants filed their motion to dismiss any "playing events" claims, the Court searched the pleadings in vain for reference to any such claim. When the Court so informed counsel for both sides, plaintiff advised the Court that it would amend. Apparently the "playing events" claim is "in the case" by way of an agreement between the parties and not through the complaint. Defendants' Response to Plaintiff's Motion to Amend. Plaintiff seeks to amend by adding the following allegations:

### COUNT FOUR

36.

Plaintiff here incorporates and repeats the allegations of paragraphs 1 through 35 of this complaint.

37.

One of the principal functions of the defendant Georgia Section is to assist its members in securing employment as golf professionals.

38.

Section 2 of the Constitution of the PGA, with which the Georgia Section is closely affiliated and whose purposes are substantially the same as the Georgia Section, provides that the "objects of the Association shall be . . . to assist deserving unemployed members to obtain a position; to improve the economic opportunity of members by the encouragement of contacts of employment that contemplate improvement of the profession through substantial adherence to Guidelines and Goals of Employ-

ment established by the Executive Committee. . . ." Section 3 of the PGA Constitution requires that the Georgia Section "adopt a Constitution and By-Laws which shall not be inconsistent with or at variance with the Constitution of the (PGA) nor with any of its rules, regulations or policies" and, upon information and belief, the Georgia Section's Constitution and By-Laws provides substantially as quoted above.

39.

The Georgia Section facilitates the employment opportunities of its members and assists the clubs and other employers in employing its members by referring members to clubs and vice versa and by otherwise acting as a clearinghouse for employment opportunity information with respect to job openings for PGA and Georgia Section member golf professionals in Georgia.

40.

The Georgia Section likewise facilitates the employment opportunities of its members by sponsoring various playing events such as pro-ams, pro-presidents and pro-assistants (hereinafter referred to as the "playing events") and the Georgia Section Championship.

41.

The primary purpose of the playing events is to display the golfing talents of the member golf professionals in front of prospective or current employers and to provide an opportunity for the Georgia Section's members to meet and play with prospective and current employers and to earn their good will.

42.

The prize money at stake in the playing events, unlike the PGA Tour where vast sums can be won, is generally nominal, and few professionals who compete in the playing events even earn expenses.

43.

Most, if not all, golf clubs and other employers of golf professionals base their decisions to employ and compensate golf professionals in substantial part on the profession's playing ability. Consequently, if a professional shoots consistently high scores in the playing events, there will be a substantial adverse impact on that individual's employment opportunities.

44.

The Georgia Section has decided to require plaintiff and other female members to compete in the playing events from the male professional (back) tees rather than from a set of shorter tees producing an equivalent course rating of difficulty for female competitors under the United States Golf Association's ("U.S.G.A.") women's course rating standards. The U.S.G.A.'s sexually segregated course rating standards have been represented by defendants to be the fair way to conduct their playing ability tests for entrance into the golfing profession through defendants.

45.

The Georgia Section, by requiring that plaintiff compete from the same back tee markers as male professionals, ensures that her scores will be substantially higher (in the 80s and 90s) than her male counterparts, with resulting, foreseeable and intended diminishment in her employment opportunities and the ability for her and her teams to compete on a fair basis with male peers and their teams.

46.

The purpose and effect of the Georgia Section's requirement that plaintiff compete in the playing events from the male professional (back) tees is to discourage female entry into the golf profession.

47.

Plaintiff is the only or one of no more than two or three female members of the Georgia Section. When the rules for 1979 playing events were adopted by the Georgia Section, plaintiff was the only female member. The Georgia Section adopted playing events rules which it knew would adversely impact plaintiff because of her sex and in retaliation for having successfully prosecuted the action in chief against defendants. Defendants have further threatened plaintiff with the assertion of massive claims for legal fees if she sought to enforce the rights set forth herein. The Geor-

gia Section has thus violated the Consent Decree (¶ 8) entered by this Court on April 2, 1979 and § 704(a) of Title VII.

48.

Defendant Georgia Section has failed and refused plaintiff's request to start a separate women members' Section Championship in lieu of separate tees for that event.

49.

The defendant PGA has directed, aided, abetted, supported and conspired with the Georgia Section in discriminating and retaliating against plaintiff as described hereinabove and, upon information and belief, by sponsoring all expenses of an unrelenting total effort to defeat plaintiff's claims.

WHEREFORE, plaintiff respectfully prays:

(1) that defendant Georgia Section be permanently enjoined from conducting the playing events in a manner which discriminates against plaintiff on account of her sex and specifically from requiring plaintiff to compete in the playing events from the mens' (back) tees instead of the tees producing the same course rating using the G.S.G.A. separate course rating standards for men and women;

(2) that an appropriate order be entered declaring and protecting plaintiff's right to participate in the Georgia Section's playing events from such tees, and that the benefits of such order be extended to other female members;

(3) that the Georgia Section be required to conduct a separate Georgia Section Championship for its female members, or if it chooses, to permit its female members to compete in the Georgia Section Championship from tees producing the same course rating using the G.S.G.A. separate course rating standards for men and women;

(4) that the Georgia Section be required to disseminate and pay for the publication of information concerning the new standards for participation of female members in the playing events and the Georgia Section Championship to such newspapers, publications of the Georgia Section and the PGA, other state and national publications, television and radio stations, and other news media as the Court deem appropriate.

(5) that plaintiff recover all of her costs, including reasonable attorneys' fees, and that no part thereof be paid from the dues of plaintiff or the plaintiff's class; and

(6) the Court award plaintiff such other relief as it may deem just and proper.

A. *Individual "Playing Events" Claims Against Georgia Section.*

The defendants, while reserving their right to contest the merits of the allegations in the amendment, do not contest the right of plaintiff to make the motion *insofar as* it asserts her individual "playing events" claims against the Georgia Section. Because the claim has been added by agreement with defendants and because defendants expressly do not oppose the motion, it is hereby GRANTED insofar as the proposed amendment seeks to assert individual "playing events" claims against Georgia Section.

B. *"Playing Events" Claims Against PGA and Class "Playing Events" Claims.*

To the extent that the proposed amendment alleges "playing events" claims against the PGA, it in effect opposes the separate motion of PGA to dismiss. That motion urges dismissal because the claim is barred by the previously mentioned letter agreement. That letter, from plaintiff's counsel, R. Lawrence Ashe, Jr., to defendants' counsel Frank C. Jones and agreed to by Mr. Jones, states, "I understood from you that the PGA Georgia Section has agreed to appoint a committee to work with Barrie Naismith to seek a mutually acceptable resolution of the playing events issue for the PGA Georgia Section (individually only)." (parenthetical in original). That letter clearly limits the playing events issue to Naismith's *individual claim against Georgia Section.* Moreover, in Plaintiff's Brief of July 9, 1979 at page 15, she states, "Defendant PGA has . . . moved to have the playing events claim dismissed as to it, but that motion is moot since plaintiff does not herein assert such a claim." Thus, the motion to amend is DENIED insofar as it

seeks to allege a "playing events" claim against PGA and insofar as it seeks to allege anything other than individual "playing events" claims; the PGA's motion to dismiss is GRANTED to the same extent.

### C. *Violation of Consent Decree.*

██ . Insofar as the motion seeks to allege a violation of the Consent Decree, defendant opposes solely on the grounds that the proper vehicle for such an assertion is a petition for contempt. Because the merits of this contention have not been briefed and because no other grounds of opposition are stated, the court will GRANT the motion to amend in the interests of justice (Rule 15(a)) without prejudice to the right of defendants to move to dismiss the allegation of a violation.

### D. *Retaliation.*

██ Insofar as the motion seeks to allege retaliation as a violation of 42 U.S.C. § 2000e–3(a), the defendants oppose the proposed amendment solely on the grounds that the claim is wholly frivolous. In their response to the motion to dismiss, plaintiffs have argued that Georgia Section (but not PGA) has retaliated against her in violation of 42 U.S.C. § 2000e–3(a), for asserting her rights under Title VII. In a reply brief, defendants argue that such an allegation is frivolous, and they notify plaintiff that continued pursuit of the allegation will be deemed by defendants as the sort of bad faith allegation that supposedly can be penalized by the award of attorney's fees. Defendants reiterate their claim of frivolousness in their response to the motion to amend. Because plaintiff states in her proposed amendment that defendant has adopted certain discriminatory practices in retaliation for her successful prosecution of the already settled action, she has stated a legally sufficient claim under 42 U.S.C. § 2000e–3(a). Accordingly, the plaintiff's motion to amend is hereby GRANTED and the defendants' motion to dismiss is hereby DENIED insofar as it seeks dismissal of

claims of retaliation on grounds other than those discussed in Part II. These two rulings are made without prejudice to the right of defendants to later move to dismiss or for summary judgment or to move for attorney's fees, if warranted, if discovery bears out their contention that the claim is frivolous.

### II. *DEFENDANTS' COMBINED MOTION TO DISMISS.*

██ In their combined motion to dismiss the "playing events" claims for lack of subject matter jurisdiction, the defendants argue that the defendants are not the employer of plaintiff and that they are not employment agencies with respect to the "playing events" claims.[1] They thus conclude that this action fails to satisfy the requirements of 42 U.S.C. § 2000e–2 which provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(b) It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

---

1. The Court has already ruled favorably on PGA's motion to dismiss on different grounds, *supra* pp. 556–557.

Plaintiff relying upon several documents prepared in connection with settlement of much of this case, responds that the issue raised by defendants has been resolved against defendants. She argues alternatively that the requirements of 42 U.S.C. §§ 2000e–2(a) and 2000e–2(b) have been satisfied.

Because the Court can rule in favor of the plaintiff on the merits of the motion, it is not necessary to deal with plaintiff's argument that the issue raised by defendants has already been resolved against them. Whether the motion is properly characterized as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) or for failure to state a claim under Rule 12(b)(6), the Court will treat the allegations in the amendment as true. This is a well-accepted standard under 12(b)(6), as well as under 12(b)(1) where discovery is needed to show the existence of jurisdiction or lack thereof. Whether treated as a 12(b)(1) or 12(b)(6) motion, the motion is hereby DENIED.[2] If discovery proves the claims to be meritless, then, of course, defendant may move again for dismissal or for summary judgment.

The merits of the defendants' motion fortunately are more readily comprehensible than the procedural posture in which it has been raised. As was earlier indicated the substantive issue in dispute is whether defendant Georgia Section and plaintiff Naismith are in an employer-employee relationship or otherwise satisfy the requirements of 42 U.S.C. § 2000e–2.

A. *42 U.S.C. § 2000e–2(a).*

Defendants argue that the words, "employment," "employer," and "employee" are to be given their common law interpretations and that Title VII does not apply outside the common law concept of employment. They rely on *Dumas v. Town of Mount Vernon*, 436 F.Supp. 866 (S.D.Ala. 1977) and *Smith v. Dutra Trucking Co.*, 410 F.Supp. 513 (N.D.Cal.1976), *aff'd*, 580 F.2d 1054 (9th Cir. 1977). Both of those cases indeed apply the common law "control" test in determining whether a given individual is an employee or rather an independent contractor. *Dumas, supra* at 872; *Smith, supra*. Defendants also rely upon several cases holding Title VII inapplicable to alleged discrimination in the administration of bar examinations. *See Tyler v. Vickery*, 517 F.2d 1089, 1096 (5th Cir. 1975); *Delgado v. McTighe*, 422 F.Supp. 725 (E.D.Pa.1977); *Woodward v. Virginia Bd. of Bar Examiners*, 420 F.Supp. 211 (E.D.Va.1976). In a supplemental brief the defendants directed the Court's attention to a recent case, *Bonomo v. National Duckpin Bowling Congress, Inc.*, 469 F.Supp. 467 (D.Md.1979). In *Bonomo* the court first noted that only tournaments run by a NDBC tournament director could receive NDBC sanctioning, and then held Title VII inapplicable to NDBC's allegedly discriminatory refusal to appoint the plaintiff as tournament director because NDBC was not an employer.

Several cases have argued very persuasively that an employer-employee relationship is not needed in order to satisfy § 2000e–2(a). In *Sibley Memorial Hospital v. Wilson*, 160 U.S.App.D.C. 14, 488 F.2d 1338 (D.C.Cir.1973), the plaintiff was a male private-duty nurse who complained that the defendant would not refer him to female patients, although it referred female nurses to male patients. The defendant there argued that "since no direct employment relationship between itself and [plaintiff] was ever contemplated by either of them, it is not an employer under the Act with respect to him." *Id.* 160 U.S.App.D.C. at 18, 488 F.2d at 1340. Judge McGowan began his analysis of defendant's argument by pointing out that the purpose of Title VII is the achievement of "equality of employment opportunities." *Id.* 160 U.S.App.D.C. at 16–17, 488 F.2d at 1340–41, *quoting Griggs v.*

---

**2.** This approach avoids the difficult question whether the motion is properly styled as a motion to dismiss for lack of subject matter jurisdiction. Clearly subject matter jurisdiction is not conferrable by agreement, whereas a party can agree to waive defenses that might be raised under Rule 12(b)(6). Were the issues to be presented, the court would have to consider the issue in light of 42 U.S.C. § 2000e–5(f)(3) an explicit grant of jurisdiction to District Courts for Title VII suits.

*Duke Power Co.*, 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158 (1969). He then turned his attention to the problem of discrimination in *access* to employment:

> Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

160 U.S.App.D.C. at 17, 488 F.2d at 1341.

Judge McGowan carefully supported his conclusion with his analysis of the statutory language. Not only does the Act prohibit discriminatory hiring and firing, but it goes on to make it unlawful "otherwise to discriminate against, any individual . . ." 42 U.S.C. § 2000e–2(a)(1). *Nothing* in the Act or legislative history *confines the definition of individual to comprehend only an employee of an employer. Sibley*, 160 U.S. App.D.C. at 17, 488 F.2d at 1341. Judge McGowan also pointed out that the Act provides that any "person aggrieved" may file a charge with the EEOC. 42 U.S.C. § 2000e–5. He rejected defendant's argument that the limitation on remedies in 42 U.S.C. § 2000e–5(g) to back pay and reinstatement indicates a Congressional attempt to fashion remedies appropriate to a direct employment relationship, noting that such remedies were no more inappropriate for labor union defendants. *Id.* 160 U.S. App.D.C. at 17–18, 488 F.2d at 1341–42.

For all of the cited reasons the D.C. Circuit concluded that "[N]either the spirit *nor, more essentially, the language* of the Act leave [the defendant] outside the reach of Title VII." *Id.* 160 U.S.App.D.C. at 18, 488 F.2d at 1342 (emphasis added).

Another case, *Puntolillo v. New Hampshire Racing Assn.*, 375 F.Supp. 1089 (D.N. H.1974), followed the *Sibley* rationale. There the defendant New Hampshire Racing Association assigned stall space to harness race drivers, and defendant New Hampshire Trotting and Breeding Association licensed those drivers. Plaintiff alleged that discrimination against him by both organizations prevented him from obtaining employment as a harness race driver. *Id.* at 1090–91. The court followed *Sibley*, concluding that the showing of an employment relationship is unnecessary where defendant has control over plaintiff's *access* to employment. *Id.* at 1092.

The *Sibley* and *Puntolillo* cases appear to be the only cases *holding*[3] that control of access to employment satisfies the requirements of 42 U.S.C. § 2000e–2(a). Other courts have cited those cases with approval, however. *E. g. Gill v. Monroe County Dept. of Social Services*, 79 F.R.D. 316, 334 (W.D. N.Y.1978); *Curran v. Portland Superintending School Committee*, 435 F.Supp. 1063 (S.D.Me.1977); *Lucido v. Cravath, Swaine & Moore*, 425 F.Supp. 123, 126 (S.D.N.Y. 1977); *Williams v. Southern Ry. Sys.*, 15 FEP 959, 964 (S.D.Ohio 1976). Indeed, this Court not only cited *Sibley* and *Puntolillo* with approval but went on to distinguish them from independent contractor cases such as *Smith*, supra:

> In *Sibley* . . . there was an employment relationship between the patient and the nurse. The court did not go so far as to say that the plaintiff could have no connection with employment and still have standing. Similarly in *Puntolillo* . . . the court did not state that the plaintiff could sue where he had no connection with an employment scheme.

---

**3.** *Williams v. Southern Ry. System*, 15 FEP 959, 964 (S.D.Ohio 1976), may so hold, but the facts are not clear.

As the court noted, driver-trainers are employed by harness horse owners.

*Mathis v. Standard Brands Chem. Industries*, 10 FEP 295, 297, n. 2 (N.D.Ga.1975). A similar rationale has been employed in a leading textbook on Title VII:

> *Sibley* and *Puntolillo* allowed individuals with only an indirect relationship to an employer to sue under Title VII. In each case, however, the plaintiff's relationship with the employer provided a connection with an employment setting. That is the crucial distinction that sets those cases apart from a business relationship which involves an independent contractor. For while an independent contractor has a direct business relationship with an employer, it is not the type of relationship which is within the zone of interest regulated by Title VII.

B. Schlei and P. Grossman, *Employment Discrimination Law* (BNA 1976) at 843.

The *Bonomo* court also distinguished *Sibley* and *Puntolillo*. The defendant NDBC was held not to be an employer for Title VII purposes because it did not "control" fifteen or more employees, 469 F.Supp. at 470. In *Sibley* and in *Puntolillo* the defendant was concededly an "employer" although not of the plaintiff. *Id.*, n. 2.

The bar exam cases are also not controlling; they did not involve employment relationships and none of the courts addressed the sort of argument presented here and in *Sibley* and *Puntolillo*. In *Tyler v. Vickery*, 517 F.2d 1089, 1096 (5th Cir. 1975) the court stated without any reasoning that the Board of Bar Examiners was not the employer of the plaintiff. In *Woodard v. Virginia Bd. of Bar Examiners*, 420 F.Supp. 211 (E.D.Va.1975), the court only rejected the argument that a bar examination was comparable to employer tests condemned in *Albemarle Co. v. Moody*, 422 U.S. 405, 425–35, 95 S.Ct. 2362, 2375–80, 45 L.Ed.2d 280 (1975) and *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Delgado v. McTighe*, 442 F.Supp. 725 (E.D. Pa.1977) followed *Woodard* and *Tyler* without discussion.

In addition, the bar exam cases are distinguishable from the present case. In those cases, and indeed even in *Sibley* and *Puntolillo* as well, the allegedly discriminatory practices had some significant purpose other than the promotion of employment opportunities. The bar exams, the nurse referencing, and the harness race driver licensing each served some sort of policing function. Here, however, the plaintiff alleges that a *"principal function"* of the defendant Georgia Section is to assist its members in securing employment and that the *"primary purpose"* of the playing events is the promotion of golf professionals before prospective employers. To the extent that discovery does not bear out these allegations, the court may be willing to reconsider the issue either in a motion for summary judgment or a motion to dismiss. *See* note 2 and accompanying text *supra*.

B. *42 U.S.C. § 2000e–2(b)*.

The parties seem to agree that *Cannon v. University of Chicago*, 559 F.2d 1063 (7th Cir. 1976), *rev'd on other grounds*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), controls the question of whether defendant Georgia Section is an employment agency. Initially the court must note that the *Sibley-Puntolillo* sort of issue is not involved here. In those cases there was no question that the defendant was an employer; the question was the extent to which it was significant that the defendant was not the plaintiff's employer. Here, the only issue is whether Georgia Section is an employment agency.

The Act itself defines an employment agency as follows:

> The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

42 U.S.C. § 2000e(c).

The plaintiff alleges that one of the defendant's "principal functions . . . is to assist its members in securing employment," which it does directly "by referring

members to clubs and vice versa. . . ." (The allegations are quoted more fully, *supra* pp. 2–5).

With these allegations in mind it is necessary to turn to the *Cannon* case to determine whether anything therein militates against holding that Georgia Section is an employment agency. In *Cannon* a female plaintiff brought suit under numerous anti-discrimination theories, including the Age Discrimination in Employment Act (ADEA), after being denied admission to defendant's medical school. The court looked to case law under Title VII to determine whether the medical school might be considered an employment agency by virtue of its placement activities:

> Plaintiff is seeking admission to the defendant schools as a medical student, not as an individual seeking employment through the schools. Plaintiff admits that the defendants have not failed or refused to refer her for employment on the basis of her age. The purpose of the Act is to provide employment opportunities and hiring for persons between the ages of 40 and 65 without discrimination based on age. This purpose was based upon the finding that older workers found themselves disadvantaged in their efforts to retain or regain employment after being dismissed from their jobs. Nothing in the statute nor the legislative history suggests a broader interpretation. *In order for an individual to state a claim under the Act, that individual must be qualified to accept employment and only then have been discriminated against on the basis of age.* Plaintiff's claim is too remote—*she has not successfully completed the necessary prerequisites to be in a position to fall within the protection of the Act.* Her complaint merely amounts to an allegation of discrimination in admission to a university and fails to state anything beyond a remote connection to discrimination in employment. As such, the complaint fails to state a claim under the Age Discrimination in Employment Act of 1967.

*Cannon, supra* at 1076 (emphasis added). The plaintiff here has not failed to satisfy any conditions of employment.

As she has alleged that defendant Georgia Section has a "principal function" of "referring" the Court concludes that she has sufficiently alleged a "regular undertaking . . . to procure for employees opportunities to work. . . ."

III. *PGA'S MOTION TO DISMISS.* See part I, B.

IV. *PGA'S MOTION FOR PROTECTIVE ORDER.*

■ PGA's motion for protective order and accompanying brief fail to state any claim of privilege, undue burden, annoyance, embarrassment, or oppression. *See* Fed.R.Civ.P. 26(b)(1) and 26(c). PGA does argue that the fact that PGA is not a party to the "playing events" claim warrants a prohibition on discovery against PGA, but PGA fails to cite any statutory or case authority for that proposition in any of the three briefs it submitted. Accordingly the motion is DENIED.

### ON DISCOVERY

This is a Title VII[1] class action in which the bulk of the substantive claims have been settled. Still pending are: (1) the individual claim of plaintiff Barrie Naismith against the Georgia Section for discrimination in the way it conducts "playing event" tests,[2] and (2) the claims of plaintiffs for attorney fees. Presently before the Court is plaintiffs' motion to compel certain types of discovery. Pursuant to Local Rule 91.62 and this Court's pretrial instructions, the Court ordered the parties to meet and confer to attempt to resolve their disputes

---

1. 42 U.S.C. § 2000e *et seq.*

2. Plaintiff Naismith alleges that the defendant Georgia Section holds "playing event" golf matches for the purpose of displaying the golfing talents of the competitors in those matches to potential employers and further that the Georgia Section discriminates against women in so doing by making women play from the back tees usually used by men rather than from the front tees ordinarily used by women.

and to resubmit any remaining disputes and all contentions relevant thereto in a single document. The parties have now done so. Indeed, they have not simply submitted each and every particular dispute but have quite admirably synthesized those disputes into discrete legal issues which they have apparently agreed control the particular discovery disputes.

While there are multiple and varied disputes, all of them involve the application of Fed.R.Civ.P. 26(b)(1):

(b) Scope of Discovery. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

With Rule 26 in mind, the Court will proceed to analyze each issue presented, initiating the discussion of each issue with the parties' statement of the question to be decided.

## I. DISCOVERY OF DEFENDANTS' ATTORNEY FEES

*Issue 1*: Is the plaintiff entitled to discovery from (a) defendants' Atlanta (lead) counsel, (b) defendant PGA's Palm Beach external general counsel, (c) defendant PGA's internal general counsel, to obtain each of the categories of infor-

mation listed in paragraphs (1) through (4) below, on the ground that such information is reasonably calculated to lead to the discovery of admissible evidence in support of plaintiff's claim for reasonable attorneys fees and expenses.

(1) Time devoted to defending plaintiff's claims;

(2) Billing rates, both for time and for results, in this case (not applicable to internal general counsel);

(3) Total fees charged or accrued (not applicable to internal general counsel);

(4) Out-of-pocket expenses incurred and accrued.

The Court will separately analyze each of the four sub-issues set out above.

### A. Defendants' Attorneys' Time

■ Defendants resist discovery of the time of their attorneys on the grounds that it is irrelevant; they assert no privilege. In support of their argument they rely on *Samuel v. University of Pittsburgh*, 80 F.R.D. 293 (W.D. Pa.1978) and *Mirabal v. General Motors Acceptance Corp.*, 576 F.2d 729 (7th Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978). Plaintiffs argue that the hours expended by defendants' attorneys are relevant to the reasonableness of the number of hours spent by plaintiffs' lawyers. *Citing Stastny v. Southern Bell Tel. & Tel. Co.*, 77 F.R.D. 662 (W.D. N.C.1978). Reasonableness of the hours their attorneys have expended is relevant, Plaintiffs contend, under *Johnson v. Georgia Hwy. Exp. Co.*, 488 F.2d 714 (5th Cir. 1974).

The first factor mentioned in *Johnson* is "time and labor required." *Id.* at 717. While the court did not expressly qualify the "time" factor with a "reasonableness" requirement, such a limitation is apparent from the opinion[3] and required by common

---

**3.** The court explicitly referred to certain inquiries that are clearly in the nature of a "reasonableness" inquiry:

(1) *The time and labor required.* Although hours claimed or spent on a case should not be the sole basis for determining a fee, *Electronics Capital Corp. v. Sheperd*, 439 F.2d

692 (5th Cir. 1971), they are a necessary ingredient to be considered. The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities. If more than one attorney is involved, the possibility of duplication of effort along

sense.[4] Such a construction was expressly made by this Court in *In re Armored Car Antitrust Litigation*, 472 F.Supp. 1357 (N.D. Ga.1979). In *Stastny*, the court held that the hours of defendants' attorneys were neither irrelevant nor privileged.[5] As to the relevancy question the court reasoned that:

> Each party must prepare to question the same witnesses, must review the same documents and other evidence, and must anticipate a presentation by the opposition of a complexity related to the facts in issue. Similarly, work on pretrial motions would reflect what volume of work opposing attorneys deemed reasonable.

77 F.R.D. at 663–64. This Court finds *Stastny's* simple rationale very persuasive. The Court need not at this time decide how much weight to place on defendants' attorneys' hours, but those hours are *at least* minimally relevant. *Mirabal* and *Samuel* rely on at least two factors in reaching the opposite conclusion from *Stastny*: (1) defendants' counsel may place more precedential value on the case than do plaintiffs' counsel, and (2) plaintiffs' attorneys may pursue frivolous claims and/or motions to increase the amount of time spent by defendants' attorneys. *Mirabal*, 576 F.2d at 731; *Samuel*, 80 F.R.D. at 294. These factors would be significant in deciding what weight to give evidence of defendants' attorneys' hours, but they do not preclude the discovery of such evidence.

*Samuel* also relies on a perceived difference in difficulty between representation of defendants and representation of plaintiffs.

*Id.* at 295–96. Defendants have not argued that their representation has been any more involved than the representation of plaintiffs. If they could so demonstrate, the Court believes, again, that such a consideration is pertinent to the weight of the evidence, not its relevance.

For the reasons stated above the defendants' attorneys' time is reasonably calculated to lead to the discovery of admissible evidence.

### B. *Defendants' Attorneys' Billing Rates*

■ Defendants also challenge discovery of their attorneys' billing rates on the grounds that the rates are irrelevant; again they do not advance any argument based on privilege. The cases discussed in the preceding section are also applicable here. *Stastny* held billing rates of defendants' attorneys relevant, 77 F.R.D. at 663, while *Mirabal* and *Samuel* held to the contrary, *Mirabal*, 576 F.2d at 731; *Samuel* at 295–96.

In *Johnson*, the Fifth Circuit determined that the "customary fee" for similar work in the community was to be considered in an award of attorneys' fees. That necessarily involves discovery from local lawyers about billing rates in Title VII cases.[6] The more particular question raised by defendants is whether such discovery should extend to the billing rates of (1) the particular lawyers (2) involved in this particular case (3) as defense lawyers. Plaintiffs contend that such evidence is just as relevant as evidence of billing rates in other large downtown Atlanta law firms similar to the firms representing plaintiffs and defend-

---

with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted. It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it. 488 F.2d at 717.

4. Defendants understandably have not argued that reasonableness is *not* a limitation on the "time" factor.

5. The court held that hours are not subject to the attorney-client privilege, 77 F.R.D. at 663, citing, *Colton v. United States*, 306 F.2d 633 (2d Cir. 1962).

6. This is especially so in light of *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), which held that fee schedules violate the antitrust laws. *Johnson*, a pre-*Goldfarb* case, had suggested the use of such fee schedules to ascertain the "customary fee." 488 F.2d at 418.

ants in this case. Defendants respond that the plaintiffs have simply engaged in an after-the-fact rationalization for their attempt to discover defendants' attorneys' rates. Regardless of when plaintiffs thought of their argument, it is persuasive. In addition, the Court believes that the extent to which defendants may have obtained high-priced legal counsel is relevant to show the reasonableness of plaintiffs in hiring high-priced counsel. The specificity of the evidence sought will go to the weight rather than relevance of the evidence.[7] Accordingly, the rates are discoverable.[8]

■ Defendants also contend that in any event the billing rates of their non-Atlanta counsel are irrelevant. The Court disagrees with this argument as the non-Atlanta counsel's rates are evidence of the reasonableness of plaintiffs in hiring high-priced counsel.[9] Accordingly, the rates of the non-Atlanta counsel are discoverable.

### C. Defendants' Attorneys' Total Fees

Defendants provide no additional arguments in response to this part of the question. Indeed, it is controlled by the discussion in parts A and B. The total fees are discoverable.

### D. Defendants' Attorneys' Out-of-Pocket Expenses

■ The expenses of defendants' attorneys were deemed discoverable in *Stastny* because they reflect "the burden to be overcome by plaintiffs and . . . the importance of the case," *Stastny*, 77 F.R.D. at 663. The Court agrees with that reasoning and further believes that, as plaintiffs argue, the expenses of defendants' attorneys are relevant to show that plaintiffs attorneys have prosecuted the action in a cost-ef-

fective fashion. Accordingly the expenses are discoverable.

### II. DEFENDANTS' ATTORNEYS' KNOWLEDGE OF COURT–APPROVED FEE AWARDS OBTAINED IN ATLANTA BY LAWYERS INCLUDING DEFENDANTS'

*Issue 2*: Is information concerning court-approved fee awards sought and obtained in the Atlanta legal community by other law firms, including defendants' counsel, reasonably calculated to lead to the discovery of admissible evidence on plaintiff's claims for costs and attorneys' fees?

Defendants object to this discovery on the grounds that it is irrelevant. This objection was discussed and rejected in Part I of this order. Inquiry into the defendants' attorneys' knowledge about fee awards will likely reveal information relevant to plaintiffs' attorneys' fees claim. *Johnson*, 488 F.2d at 719 ("The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit.")

■ Defendants argue alternatively that,

Even if information about past fee petitions is relevant, plaintiff's discovery requests are objectionable in that they seek to discover information which defense counsel have obtained as individual members of the Bar, not information obtained in their role as defense counsel in this case. While plaintiff may be correct in asserting that a party may discover information in the possession of a party's representatives or attorneys, such discovery must be limited to information obtained in the course of, or as a result of, representation of a party to the litigation, i. e.,

---

7. Because of the Court's conclusions in Parts I, A & B, it need not address plaintiffs' arguments that the hours and rates are placed in issue by defendants' threat to seek attorneys' fees with respect to plaintiff's claim of retaliation and by defendants' attempt to obtain attorneys' fees in connection with this motion to compel. As to the latter contention, see Part IX, *infra*.

8. The Court intends no prejudice to the right of defendants to seek a protective order providing

for the confidentiality of their attorneys' billing rates.

9. *Stastny* considered the fees charged by an Atlanta firm (coincidentally the plaintiffs' attorneys in this case) relevant to the attorney fees of Charlotte, North Carolina plaintiffs' lawyers. 77 F.R.D. at 663. *Stastny* deemed any spread between Atlanta fees and Charlotte fees to be a question of weight of the evidence. *Id.*

information which would be available to the party served with the interrogatory. Joint Stipulation Regarding Discovery at p. 13. It is clear that a party served with interrogatories has an obligation to reveal information held by his attorneys. *E. g. Hickman v. Taylor*, 329 U.S. 495, 504, 67 S.Ct. 385, 390, 91 L.Ed. 451 (1947) ("A party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney."); *Miller v. Doctor's General Hospital*, 76 F.R.D. 136, 140 (N.D. Okla.1977) ("If an appropriate interrogatory is propounded, the answering party will be required to give the information available to him, if any, through his attorney . . ."); *Pilling v. General Motors Corp.*, 45 F.R.D. 366, 369 (D. Utah 1968) (*Citing and paraphrasing Hickman, supra.*); *Maryland ex rel. Petters v. Baltimore & O.R. Co.*, 7 F.R.D. 666, 667 (E.D. Pa.1947) ("The plaintiff, having authorized her attorney to bring this suit, to appear for her and prepare for and conduct the litigation, was bound to disclose facts relating to the accident in his possession even though at the time she answered the interrogatories the information may not have been transmitted to her."); 8 C. Wright & A. Miller, *Federal Practice and Procedure: Civil*, § 2171 at p. 530, § 2177 at pp. 561, 562 (1970). These cases impose upon a party a broad duty to disclose matters within the knowledge of a party's attorney, but neither party here has cited any case dealing with discovery of information in the possession of a party's attorney where the information was obtained outside the course of the instant litigation.

There is, of course, one specific provision in the discovery rules which protects from discovery certain information within the knowledge of attorneys—the work product rule—in Fed.R.Civ.P. 26(b)(3); the defendants do not even attempt to obtain the protection of this rule nor do they advance any other argument in the nature of a privilege. They point to no particular language in the Federal Rules of Civil Procedure which protects from discovery information obtained by a party's attorneys outside the scope of the instant litigation and

the Court has likewise found none. The Court thus concludes that this second question must be answered in the affirmative.

## III. DISCOVERY FROM PGA AS TO "PLAYING EVENTS" AND FROM PGA AND GEORGIA SECTION AS CLASS REPRESENTATIVES

*Issue 3*: Is the PGA subject to party discovery on the playing events question, and are the PGA and the Georgia Section subject to discovery as defendant class representatives on how other PGA sections are conducting their respective playing events?

Plaintiffs contend that this issue is controlled by this Court's order of October 11, 1979, 85 F.R.D. 561, (N.D. Ga.1979) wherein the Court denied PGA's motion for a protective order, reasoning as follows:

> PGA's motion for protective order and accompanying brief fail to state any claim of privilege, undue burden, annoyance, embarrassment, or oppression. *See* Fed.R.Civ.P. 26(b)(1) and 26(c). PGA does argue that the fact that PGA is not a party to the "playing events" claim warrants a prohibition on discovery against PGA, but PGA fails to cite any statutory or case authority for that proposition in any of the three briefs it submitted.

Defendants again argue that the limited scope of the remaining claims necessarily implies a limitation on the scope of discovery, but again they fail to present any authority for their position. The Court believes that the reasoning of the earlier order allows the plaintiffs to obtain the desired discovery.

Rule 26 permits discovery as to "any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." The discovery at issue here is neither irrelevant nor privileged, and the subject matter of the discovery is "involved in the pending action." While Rule 26 defines the scope of discovery in general, other discovery rules further limit discovery to the information obtainable from a party. For example, Rule 33(a) provides that, "Any party may serve upon

any other party written interrogatories . . . ," Rule 34(a) provides that, "Any party may serve upon any other party a request . . . to produce . . ." and Rule 36(a) provides that, "A party may serve upon any other party a written request for . . . admission . . . ." Nothing in those rules further limits the burdens of discovery to parties to a particular claim. The language of former Rule 33 may have been more susceptible of the interpretation suggested by defendants: "Any party may serve upon an *adverse party* written interrogatories . . . ." Fed.R.Civ.P. 33 (1948) (emphasis added).

Not only can defendants find no solace in Rule 26 or the "party" limitations, but they again suggest none of the grounds for a protective order: "annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed.R.Civ.P. 26(c). While the Court would construe those grounds for a protective order in light of the fact that the PGA is not a party to the playing events claim, resulting in a more liberal grant of a protective order than were the PGA a party to the claim, the defendant here has not suggested the presence of any of those grounds. The third question is answered in the affirmative.

## IV. DISCOVERY AS TO SEXUALLY DISPARATE STANDARDS APPLIED BY DEFENDANTS TO PLAYING ABILITY TESTS

*Issue 4*: Is information concerning sexually disparate standards applied by defendants in the conduct of their playing ability test, including modifications which were made after plaintiff's initial Title VII charge was filed against defendants, reasonably calculated to lead to the discovery of admissible evidence on: (a) whether sexually disparate standards should be applied by defendant Georgia Section in its team playing events; (b) whether defendant Georgia Section should offer individual playing events for its current and prospective female members; and (c) plaintiff's claims for attor-

neys' fees and expenses as the prevailing party?

■ As defendants point out, this fourth issue, as well as the next two, involve the related problem of discovery into matters already settled in the consent decree of April 2, 1979; however, the Court does not view that consideration as determinative of the issues. According to the plaintiff, the PGA and its sections have modified the playing ability [10] test by allowing women to play from tees which are closer to the putting green than are the tees used by men. Plaintiff argues that the defendants have thereby "effectively admitted the adverse, unfair and unnecessary impact of requiring women to compete in golfing events from the same tees as men . . . ." Joint Stipulation Regarding Discovery at p. 17. Plaintiff further contends that such information would be demonstrative of the results achieved by plaintiffs in this case and would thus be relevant to the attorney fees issue.

Defendants respond first that there is "no connection" between the "playing ability" and "playing events" test. The Court believes that the necessary "connection" or relevance lies precisely where plaintiff points—in the fact that both tests involve women playing golf from the same tees as men. The reason for and results of the change in the playing ability tests are relevant to determining whether Georgia Section's playing events test is discriminatory.

Defendants also attempt to refute the plaintiffs' reliance on the attorney fees issue to establish relevance. Under *Johnson, supra*, one of the factors relevant to the attorney fees issue is the "result obtained." 488 F.2d at 718. A more recent case noticeably leaves out that factor. *Mitchell v. Scheepvaart Maatschappij Trans-Ocean*, 579 F.2d 1274, 1281, n. 10, ¶ 8 (5th Cir. 1978). *Mitchell*, unlike this case and *Johnson*, was not an employment discrimination case, and the *Johnson* court's reasoning as to the significance of the result obtained would seem to outlive *Mitchell*: "If the decision corrects across-the-board discrimination affect-

---

**10.** The "playing ability" test is used to control membership in defendants. *Compare* the "playing events" test, *supra* note 2.

ing a large class of an employer's employees, the attorney's fee award should reflect the relief granted." 488 F.2d at 713. *See also Armored Car*, 472 F.Supp. at 1386 (reciting "results obtained" as factor in attorney fees determination in class action antitrust case).

Thus, the fourth issue must be answered affirmatively.

## V. DISCOVERY OF PGA'S PAST POLICIES REGARDING FEMALES AND REASONS FOR CHANGE THEREOF

*Issue 5*: Are the immediate past policies of the PGA regarding females, and the reason for changes in their policies, relevant to plaintiff's claims for costs and attorneys fees?

Plaintiff's sole argument here is that this discovery is relevant to the attorney fees issue. Defendants again point out that PGA's past policies have been litigated and settled in the consent decree. For the reasons stated in Part IV in the discussion of the "result obtained," the answer to this question is "yes."

## VI. DISCOVERY AS TO WHETHER PGA DISCOURAGED LPGA FROM ASSISTING PLAINTIFFS

*Issue 6*: Are questions concerning whether or not the PGA discouraged the LPGA from assisting plaintiff in this action relevant to the plaintiff's claim for costs and attorneys' fees?

■ With respect to issue six plaintiffs contend that the information sought is relevant to the attorney fees issue under *Johnson, supra*, to show the extent to which plaintiffs had to " 'go it alone' on a totally contingent fee basis without any institutional support." Joint Stipulation Regarding Discovery at p. 22. Plaintiffs also argue that the information will show the reasonableness of the time spent by their attorneys, "because such expert assistance as the LPGA might have provided was withheld at the instance of the defendants." *Id.*

The *fact* that the LPGA did not assist plaintiffs is relevant to the reasonableness of hours spent by plaintiffs' attorneys, but the reasons for the LPGA's failure to help are not. Accordingly the answer is yes as to the *fact* but otherwise "no."

## VII. APPLICABILITY OF FED. R. EV. 615 TO DEPOSITIONS

*Issue 7*: Does Rule 615 of the Federal Rules of Evidence apply to depositions which include use as evidence at a trial on the merits for which plaintiff has invoked Rule 615? If not, is plaintiff entitled to have such depositions sealed pursuant to Rule 26(c) of the Federal Rules of Civil Procedure?

■ Plaintiffs have attempted to invoke the "Rule of Sequestration," Fed.R.Ev. 615, which provides:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

It is clear that the Federal Rules of Evidence apply *at* depositions. Fed.R.Civ.P. 30(c) ("Examination and cross-examination of witnesses may proceed as permitted at the trial under the provisions of the Federal Rules of Evidence.") It is apparent, however, from the parties' arguments that the real issue is whether witnesses must be "sequestered" between deposition and trial. Plaintiffs argue that not to so apply "The Rule" would allow it to be effectively circumvented. Defendants argue that, to the contrary, to invoke "The Rule" between deposition and trial effectively invalidates Fed.R.Civ.P. 26(c); it allows for the issuance of a protective order only upon the showing of "good cause." The Court agrees with the latter argument; Rule 615 does not apply between deposition and trial.

Plaintiffs point out that a finding of discrimination necessarily involves the drawing of inferences and contradictions from circumstantial evidence. Thus, they contend, the non-application of "The Rule" and the failure to grant a protective order will

allow defendants' witnesses to make their testimony more consistent by reading transcripts of one another's depositions. Such a practice can obviously create serious questions as to a witness' credibility, especially if he changes his testimony after his deposition. The Court recognizes, however, that such a sanction may not be totally effective and that the practice discussed here should be avoided if possible. Because of the need to rely almost solely on circumstantial evidence in proving discrimination, the Court ORDERS that the parties and attorneys in this case ensure that no witness discuss with anyone his own or any other deposition taken in this case, without further order of Court or consent of the plaintiffs.

## VIII. DEPOSITION OF PGA OFFICIAL, GARY WIREN

*Issue 8*: Is plaintiff entitled to take the deposition of PGA Gary Wiren on the playing events issue?

Plaintiffs seek to depose Wiren pursuant to Fed.R.Civ.P. 30(b)(1).[11] Defendants object that the PGA is not a party to the playing events claim. This argument must be rejected for the reasons set forth in Part III, *supra*. Defendants further contend that "the depositions should not proceed until the Court has clarified the scope of discovery with regard to the playing events claim." Joint Stipulation Regarding Discovery at p. 29. The Court is not sure it comprehends the meaning of that argument, but to the extent that relevant motions have been submitted to the Court, the Court has so clarified the issue in this order and in the order of October 11.

Accordingly this issue is answered in the affirmative.

## IX. ATTORNEY FEES AND EXPENSES

*Issue 9*: If defendants obtain an order denying discovery on the issues set forth above, to what award, if any, of the reasonable attorneys fees and expenses are defendants entitled under Fed.R.Civ.P. p. 37.

Neither party shall be entitled to attorney fees or costs incurred in connection with the issues resolved in this order as the positions taken by both parties were "substantially justified." Fed.R.Civ.P. 37(a)(4).

## X. SUMMARY OF ANSWERS

<u>Issue 1</u>: (1) – Yes; (2) – Yes; (3) – Yes; (4) – Yes.

<u>Issue 2</u>: Yes

<u>Issue 3</u>: Yes

<u>Issue 4</u>: Yes

<u>Issue 5</u>: Yes

<u>Issue 6</u>: Yes as to the fact; otherwise no.

<u>Issue 7</u>: No with respect to Fed.R.Ev. 615; Yes with respect to Fed.R. Civ.P. 26(c).

<u>Issue 8</u>: Yes

<u>Issue 9</u>: Neither party is entitled to attorneys fees or expenses in connection with this motion.

---

**11.** Rule 30(b)(1) provides in part: "A party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every other party to the action." Rule 30(b)(1) is not preempted by Rule 30(b)(6). 4A *Moore's Federal Practice* ¶ 30.57[13].