The NATIONAL ORGANIZATION FOR WOMEN, NEW YORK CHAPTER et al., Plaintiffs,

v.

WATERFRONT COMMISSION OF NEW YORK HARBOR and Leonard Newman, Defendants.

No. 78 Civ. 4075.

United States District Court, S. D. New York.

March 23, 1979.

Lewis Tesser, New York City by Marjorie Altman, New York City, of counsel, for plaintiffs.

Irving Malchman, Director of Litigation and Research Waterfront Commission of New York Harbor, New York City by Ellen J. Bronzo, Asst. Counsel, New York City, of counsel, for defendants.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

This motion to dismiss raises the question of whether the licensing activities of the defendant Waterfront Commission of New York Harbor ("the Commission") come within the terms of Title VII of the Civil Rights Act of 1964, as amended in 1972, 42 U.S.C. § 2000e et seq. ("the Act"). Plaintiffs—the National Organization for Women and various individual women—claim that the Commission discriminated on the basis of gender in confining the acceptance of applications for cargo checker jobs to registered longshoremen, a group that has historically been predominantly, if not exclusively, male.[1] Plaintiffs originally brought this action only under the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981, 1983. They have since, however, amended their complaint to add the Title VII claim that is the focus of the instant motion. In this motion, the Commission contends that in its capacity as an inter-state licensing agency, created with the consent of Congress, it is neither an "employer" nor an "employment agency" under the terms of the Act and that its licensing activities cannot, therefore, form the basis of a Title VII claim. We agree and grant defendants' motion to dismiss the Title VII cause of action.

The principle facts relating to plaintiffs' claims are set forth in our previous opinion, (D.C.) 460 F.Supp. 84, in which we granted in part and denied in part defendants' motion for summary judgment and denied an application by plaintiffs for preliminary injunctive relief.[2] Those facts need not, therefore, be rehearsed here. Some discussion of the Commission's history and activities is, however, in order.

The Commission was created in 1953 by acts of the state legislatures of New York (N.Y.Laws 1953, cc. 882, 883, McK.Unconsol. Laws § 9801 et seq.) and New Jersey (N.J. Laws 1953, cc. 202, 203, N.J.S.A. 32:23–1 et seq.), with the consent of Congress to their inter-state compact (P.L. 252, c. 407, 67 Stat. 541, 83d Cong., 1st Sess.). During the years preceding the enactment of the Compact, criminal activities on the waterfront had been the subject of various investigations, including inquiries by the New York State Crime Commission, the New Jersey Law Enforcement Council, a Hudson County New Jersey Grand Jury, and a sub-committee of the United States Senate Committee on the Judiciary. The findings of the Senate sub-committee, which concluded that "New York has America's toughest and foulest waterfront," are perhaps typical (Senate Rpt. No. 653):

"(b) Criminal exploitation and extortion. —Criminal elements and criminal activities are firmly entrenched on the waterfront primarily through their grip on the organized labor movement. For many years it has been generally accepted that the place for an ex-convict to find employment is around the docks. This, standing alone, would not be objectionable; no doubt many men who have paid their debt to society have been able to make a new start in such employment. But in this instance the scales have tipped the other way: the waterfront is not where a man can 'go straight'—it is where he can keep crooked. Criminals whose long records belie any suggestion that they can be reformed have been monopolizing controlling positions in the International Longshoremen's Association and in local unions. Under their regimes gambling, the narcotics traffic,

1. Women may soon be working as longshore-persons. By resolutions dated September 5, 1978 and January 10, 1979, the Commission has provided for the distribution of some 827 applications in order to register not more than 750 persons on a temporary basis (for not more than six months). Some 108 of these 827 applications were distributed to women.

2. In our earlier opinion, we granted defendants' motion for summary judgment insofar as it was addressed to claims of racial and ethnic dis-

crimination and denied that motion insofar as it was addressed to claims of gender-based discrimination brought under sections 1981 and 1983. Despite our previous dismissal of the race and ethnicity claims, they resurfaced in the third count of the amended complaint. Defendant has again moved—without opposition—to dismiss such claims. For the reasons stated in our previous opinion, we grant that motion.

loansharking, shortganging, payroll 'phantoms', the 'shakedown' in all its forms—and the brutal ultimate of murder—have flourished, often virtually unchecked." (p. 7)

To loosen the "stranglehold on port activities" "that criminals, racketeers and hoodlums had acquired" (*Hazelton v. Murray* (1956) 21 N.J. 115, 121 A.2d 1, 4 (Brennan, J.)), the Commission was empowered under the Compact to register longshoremen and cargo checkers and to license stevedores, pier superintendents, hiring agents, and port watchmen as prerequisites to their work on the waterfront. Under the Compact, the Commission is given the power to deny registration to any person who has been convicted of serious crimes or who otherwise lacks "good character and integrity" (in the case of checkers, McK.Unconsol.Laws § 9918(3)(a)) or whose presence constitutes a "danger to the public peace or safety" (in the case of longshoremen, McK. Unconsol.Laws § 9829(c)). As recognized by the courts and in the Compact itself, these regulations were enacted in the exercise of the states' police power. McK.Unconsol.Laws § 9805; *Linehan v. Waterfront Commission of New York Harbor* (S.D.N.Y. 1953) 116 F.Supp. 683 (three-judge court, opinion by A. Hand, J.), *aff'd* without majority opinion (1954) 347 U.S. 439, 74 S.Ct. 623, 98 L.Ed. 826; *Hazelton, supra* and cases cited therein.

In addition to its licensing and registration functions, the Commission also controls the size of the registers for longshoremen and checkers. Such registers were originally open to all applicants who met the criteria above outlined. In response to the advent of containerization, however, the registers were closed in 1966 by the enactment of Section 5–p of the Waterfront Commission Act. That section vests in the Commission the power to accept or suspend applications after evaluating the desirability of an increase in the size of the waterfront work force. If the Commission determines that a register should be opened, it publicizes its decision by issuing press releases. There is no claim that it otherwise solicits applications.

Although all hiring is conducted at "employment information centers" established and maintained by the Commission, McK. Unconsol.Laws § 9853, the Commission exercises no control over individual hiring decisions. Instead, such decisions, under the Compact, are to be made by "hiring agents" licensed by the Commission and employed by stevedores or carriers, McK.Unconsol. Laws §§ 9806, 9905(9), under methods to be determined by longshoremen and their employers through collective bargaining. McK.Unconsol.Laws § 9869. We are advised by the Commission that it has used its authority over hiring agents to deny licenses to any who discriminated in employment on grounds of color, race, creed or sex. Plaintiffs take the position that these activities, taken together, render the Commission either an "employer" or an "employment agency" under the terms of Title VII. We disagree.

*Discussion*

The provisions of Title VII upon which plaintiffs rely, insofar as here relevant, are as follows (42 U.S.C. § 2000e):

"(b) The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . .

(c) The term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person."

When Title VII was originally enacted, state governments and their subdivisions were exempted from the foregoing provisions. However, in 1972 this exemption was removed by the deletion of language that excluded "a State or political subdivision thereof" from the definition of "employer" and that excluded agencies of states

and their subdivisions from the definition of "employment agency".[3]

A simple reading of the above definitions suffices to demonstrate that they are not intended to apply to the kind of licensing activity in which the Commission engages. In its licensing role, the Commission neither pays the wages nor engages the services of persons it registers. Nor does it undertake to obtain workers for employers or jobs for workers. It is, therefore, neither an "employer" nor an "employment agency" with respect to persons desiring registration.

Our analysis of the legislative history supports this conclusion. That history in no way suggests that Congress, in removing the exemption for state government "employers", intended to benefit anyone other than those actually employed or seeking to be employed by state governments or their subdivisions. While supporters of the bill, in the committee reports and debates, repeatedly referred to the approximately ten million non-federal government jobs that would be affected by the expanded coverage,[4] the history is barren of any reference to either state licensing agencies or the many persons registered by them. We also find it significant that the states-rights oriented opponents of the legislation apparently did not perceive any attempt to interfere with the regulatory functions of the states' licensing agencies. They never mentioned the subject in their opposition to the proposed amendment.[5]

The cases that have found Congress to have intended the above definitions of "employer" and "employment agency" to encompass licensing activities like those of the Commission (*Gill v. Monroe County Dept. of Social Services* (W.D.N.Y.1978) 79 F.R.D. 316, 334; *Puntolillo v. New Hampshire Racing Commission* (D.N.H.1974) 375 F.Supp. 1089, 1092; see also *Cianco v. Family Life Insurance Co. and the State of California Department of Insurance* (EEOC May 6, 1975) Decision No. 75–249, EEOC Decisions ¶ 6457) rest, in our judgment, on a misapplication of the District of Columbia Circuit's opinion in *Sibley Memorial Hospital v. Wilson* (1973) 160 U.S.App.D.C. 14, 488 F.2d 1339. The *Sibley* case had nothing to do with state police power. The situation with which the court was there concerned was an attempt by a hospital to interject itself into the employment of nurses by its patients in such a fashion as to frustrate the efforts of a nurses' registry to prevent discrimination on grounds of gender. The registry had adopted procedures whereby a patient in requesting the assignment of a nurse was prohibited from expressing any preference as to gender, and—although permitted to reject any nurse assigned—was required to pay one day's salary to any nurse rejected for an improper cause (such as gender-based discrimination). Thus, the registry

---

3. The statute originally defined "employer" and "employment agency" as follows (P.L. 88–352, 78 Stat. 253–54):

    "(b) The term "employer" means a person engaged in an industry affecting commerce who has twenty-five or more employees . . and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or a State or political subdivision thereof . .

    (c) The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person; but shall not include an agency of the United States, or an agency of a State or political subdivision of a State, except that such term shall include the United States Employment Service and the system of State and local employment services receiving Federal assistance." The Court of Appeals for this Circuit has recently observed that the 1972 amendments resulted in making Title VII applicable "to states and political subdivisions *as employers.*" *Association Against Discrimination in Employment v. City of Bridgeport* (2d Cir. 1979) 594 F.2d 306 (emphasis added).

4. See e. g. Legislative History of the Equal Employment Opportunity Act of 1972, at 77 (House Report No. 92–238), 418 (Senate Report No. 92–415), 1115 (remarks of Senator Williams), 1173–74 (remarks of Senator Javits).

5. That opposition focused instead upon examples drawn from traditional employer-employee relationships. See e. g. id. at 622–23 (remarks of Senator Ervin concerning hiring by state governor of personal secretary), 1077–83 (remarks of Senator Ervin).

attempted to discourage discrimination by placing an economic burden on those who practiced it. Using its power to control its patients' environment, the defendant hospital (or so it was alleged) frustrated the registry's efforts by the simple device of prohibiting male nurses from presenting themselves to female patients. When sued by a male nurse whose attempt to find employment had been thus blocked, the hospital defended on the grounds that as a technical matter there had been no employer-employee relationship between it and the plaintiff. In rejecting this defense, the court used language that—taken out of context and, as we believe, misapplied—has led some courts and the EEOC to conclude that Title VII authorizes the regulation of licensing activities undertaken by the several states in the exercise of their police power. We do not believe that the *Sibley* case supports any such conclusion, which, we believe, would be inconsistent with the clear intent of Congress. We note that Judge Sweet, in a well-reasoned opinion, has agreed with the views herein expressed. *Lavender-Cabellero v. Dept. of Consumer Aff., Etc.* (S.D.N.Y.1978) 458 F.Supp. 213, 215. See also *Tyler v. Vickery* (5th Cir. 1975) 517 F.2d 1089, 1096 (state board of bar examiners not an "employer" or "employment agency") (dicta); *Delgado v. McTighe* (E.D.Pa.1977) 442 F.Supp. 725, 729–30 (state board of bar examiners).

The court in *Puntolillo, supra,* in coming to the conclusion that Congress must have intended to subject state police power to federal regulation, was "impressed with the fact that 'the Act has addressed itself directly to the problems of interference with the direct employment relationship by labor unions and employment agencies . . .'" 375 F.Supp. at 1092 (quoting *Sibley, supra* 488 F.2d at 1342). We draw the opposite conclusion from this example of careful draftsmanship. We cannot believe that a Congress that had before it such a meticulous enumeration of the categories of entities covered by the Act [6] would have left to

speculation and conjecture any desire to subject to federal regulation city and state licensing activities of which it was obviously aware. On the contrary, we must assume that Congress was cognizant of the Supreme Court's repeated reminder that it disfavors "inroads by implication on state authority." *Palmer v. Massachusetts* (1939) 308 U.S. 79, 84, 60 S.Ct. 34, 37, 84 L.Ed. 93. See e. g. *F.T.C. v. Bunte Bros.* (1941) 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881; *Minnesota Rate Cases* (1913) 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511; cf. *Kelly v. Washington ex rel. Foss Co.* (1937) 302 U.S. 1, 9–10, 58 S.Ct. 87, 82 L.Ed. 3.

Our conclusion that the Commission's licensing activities are beyond the reach of Title VII does not wholly insulate those activities from charges of discrimination. Plaintiffs may still pursue their claims under Sections 1981 and 1983. If their path is more difficult under those sections than it would be under Title VII, that is a matter for the consideration of Congress, and not the courts.

Finally, our consideration of the instant motion has prompted us to reconsider the previous motions for summary judgment [7] and for preliminary injunctive relief. Upon further consideration, we adhere to our previous decisions. In summary, we grant the motion to dismiss the Title VII claim, grant the motion to dismiss the claims of racial and ethnic discrimination, and deny the motions for a preliminary injunction and for summary judgment on claims of gender-based discrimination brought under sections 1981 and 1983. With respect to the Title VII claim and the claims of ethnic and racial discrimination, we certify, pursuant to Fed.R.Civ.P. 54(b), that there is no just cause for delay and accordingly direct the clerk to enter final judgment dismissing these claims. With respect to the denial of defendants' motion for summary judgment on claims of gender discrimination under sections 1981 and 1983, we certify, pursuant to 28 U.S.C. § 1292(b), our belief that such

6. As discussed, supra at 5, those categories were included in Title VII as originally enacted. See fn. 3.

7. See fn. 2.

322

denial involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal may materially advance the termination of the litigation.

Let defendants submit an order that will permit the Court of Appeals (should it accept our § 1292(b) certification) to dispose of all of these matters at one sitting.

SO ORDERED.