The UNITED STATES of
America, Plaintiff,

v.

The NEW YORK STATE DEPART-
MENT OF MOTOR VEHICLES, The
New York State Department of Edu-
cation, and The Three Village Central
School District, Defendants.

No. 96 CV 2935(ARR).

United States District Court,
E.D. New York.

Jan. 12, 2000.

Sanford M. Cohen, United States Attorney's Office, Civil Division, Brooklyn, NY, for United States of America.

Clement J. Colucci, Lisa R. Dell, Attorney General of State of N.Y., New York City, for New York Department of Motor Vehicles and Board of Education.

Vanessa M. Sheehan, Maureen E. Halloran, Guercio & Guercio, Plainview, NY, for Three Village Central School District.

## OPINION AND ORDER

ROSS, District Judge.

This action was brought by the United States against two New York state agencies, the Department of Motor Vehicles ("DMV") and the Department of Education ("SED"), and the Three Village Central School District (the "District") under the Americans with Disabilities Act (the "ADA"). The case is the second to arise from the refusal of the Amboy Bus Company ("Amboy") to hire Theodore Bacalakis as a school bus driver due to regulations of DMV and SED (collectively, the "State Defendants") barring operation of a bus by any individual missing a limb and a contract between Amboy and the District that incorporated the regulations. On August 19, 1998 in a separate action, *Equal Employment Opportunity Comm'n v. Amboy Bus Co.*, 96–CV–5451, this court determined that Amboy, despite its good faith adherence to state regulations, was liable for its violation of the ADA. The United States separately sued the three defendants in this action seeking to compel the agencies to amend their regulations and seeking damages for Bacalakis. All par-

ties now move for summary judgment on the issue of liability and the availability of an award of back pay.[1]

## FACTUAL BACKGROUND

Theodore Bacalakis, an alumnus of the Three Village Schools, began driving a school bus on District routes for Amboy in 1986. On August 10, 1991, Bacalakis was struck by a car while off-duty and, as a result, lost his left leg below the knee. He underwent extensive rehabilitation and was fitted with a prosthesis. During his convalescence he remained in touch with Amboy, and by May 1993 was able to resume his duties. Bacalakis therefore paid a visit that month to Joseph LoGelfo, his manager at Amboy, hoping to return to work.

LoGelfo informed Bacalakis, however, that he was no longer qualified to drive a bus in New York. A DMV regulation then in place read:

A person is physically qualified to drive a bus if he or she has no loss of a foot, a leg, a hand or an arm, except that if a person has been employed by a motor carrier and has suffered a loss of a foot, leg, hand or an arm prior to the biennial physical examination of July of 1978 and he or she has demonstrated an ability to safely operate a bus, he or she may be deemed to be physically qualified in spite of such loss.

15 N.Y.C.R.R. § 6.11(b)(1). Bacalakis was also prohibited from operating a school bus by an SED regulation:

Physical fitness: (1) Each driver of a school transportation conveyance shall meet the requirements of § 6.11 of the regulations of the Commissioner of Motor Vehicles and the following basic minimum physical requirements:

***

(ii) shall have all limbs, hands and feet, including sufficient digits on each hand and the use thereof to enable the driver to control and safely operate the vehicle . . . .

8 N.Y.C.R.R. § 156.3(c). LoGelfo was sympathetic, but explained to Bacalakis that the regulations prohibited Bacalakis from driving a school bus. He took Bacalakis out for a drive in a bus that day, for at least part of which Bacalakis drove. But for the regulations, LoGelfo would have rehired Bacalakis. He recommended that Bacalakis contact the bus driver certification unit of DMV to inquire whether he might somehow qualify to drive a bus. Bacalakis did so and was told that no exception could be made under the regulation.

Shortly before the 1993–94 school year began, Bacalakis attended the "pick," at which the drivers selected their routes based on seniority. Bacalakis was not permitted by LoGelfo to participate on the ground that he was not qualified to drive a bus. In October, Bacalakis again visited LoGelfo, seeking reinstatement. LoGelfo told him that, in light of DMV's response to Bacalakis's inquiry seeking an exception, LoGelfo could not hire him. He suggested that Bacalakis might talk to Eileen McCarthy, the District's Transportation Coordinator.

Bacalakis met with McCarthy in December 1993. She was the District official who managed the contract with Amboy. Under that contract and by SED regulation, the District had to approve every driver who transported students. McCarthy was responsible for reviewing each application submitted by Amboy and recommending approval to the Superintendent. McCarthy was quite sympathetic to the driver's plight. While Bacalakis was in her office she placed a call to the Transportation

1. Because the agencies have satisfactorily amended their regulations since the commencement of this action, the United States no longer seeks injunctive relief. *See* Plaintiff's Mem. of Law 16. It continues to seek non-pecuniary damages on Bacalakis's behalf, but acknowledges that there are issues of material fact with respect to their calculation and does not seek an award by summary judgment. *See id.* at 17.

Supervisor at SED to ask whether some exception might be made to what McCarthy viewed as an unfair rule. According to McCarthy, the SED official responded angrily, and insisted that the District must abide by the regulation. McCarthy therefore informed Bacalakis that her hands were also tied, and that she could not help him.

On December 15, 1993, Bacalakis filed a charge against Amboy with the EEOC. On March 3, 1994 he did the same against DMV, SED, and the District. The EEOC issued reasonable cause determinations that all four parties violated the ADA on September 28, 1994. Conciliation attempts failed, including negotiations between Plaintiff and DMV and SED to amend their regulations, and on June 13, 1996 this action was commenced. On August 28, 1996, New York rescinded its regulations prohibiting individuals missing limbs from driving school buses and Amboy reinstated Bacalakis within a week. On November 5, 1996, the EEOC brought suit against Amboy. As noted above, Amboy was held liable for damages to Bacalakis for the period preceding his reinstatement. The damages were set by consent decree in the amount of $49,000.

All parties in this case agree that Bacalakis is an individual with a disability within the meaning of the ADA and that he is qualified to drive a school bus. All agree also that the blanket refusal to hire amputee school bus drivers violated the ADA. At issue is whether DMV, SED, and the District discriminated against him and, if so, to what damages he is entitled.

## DISCUSSION

### I. The Standard for Summary Judgment

In ruling on a motion for summary judgment, judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists," *Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994), but "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), but the non-moving party "must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In making the necessary showing, "[c]onclusory allegations [by the non-moving party] will not suffice to create a genuine issue." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d.Cir.1990). A "genuine" issue is one that could be decided in favor of the non-moving party based on the evidence by a reasonable jury. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. The role of the court in deciding a motion for summary judgment is not to decide issues of fact, but only to determine whether or not they exist. *Rattner v. Netburn*, 930 F.2d 204, 209 (2d.Cir.1991).

### II. The Defendants as Employers

All three defendants move for summary judgment on the ground that they were not covered entities under Title I of the ADA with respect to Bacalakis, and therefore that title's strictures did not bind them in this situation. A "covered entity" is defined for the purposes of Title I as "an employer, employment agency,

labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). The parties agree that if the defendants are covered entities, it is because they fall under the definition of "employer." That term means "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person. . . ." 42 U.S.C. § 12111(5)(A). The State Defendants do not contend that they do not meet this definition generally, but argue that, with respect to Bacalakis specifically, Amboy, and perhaps the District, were employers, not DMV and SED. *See* State Defendant's Mem. of Law 14 n. 10. The District argues that only Amboy employed Bacalakis. *See* District's Mem. of Law 7. Whether an entity is an "employer" is a question of law. *See Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F.Supp. 344, 348 (S.D.N.Y.1984).

### A. *Interference and the Sibley Line of Cases*

■ The term "employer" as used in civil rights laws extends beyond the entity that pays an individual his or her paycheck. A defendant that does not have a direct employment relationship with a plaintiff may nonetheless be liable under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act (ADEA), or the ADA for its discriminatory acts if it interferes with the plaintiff's employment opportunities with a third party and the defendant controls access to those opportunities.[2]

This principle was first articulated in *Sibley Memorial Hosp. v.. Wilson*, 488 F.2d 1338 (D.C.Cir.1973). In that case, a male private-duty nurse relied on referrals from the hospital, but was not an employee of the hospital. The court sustained a Title VII action against the hospital when hospital staff twice refused to refer the plaintiff to female patients on the basis of his sex. *See id.* at 1339–40. The goal of providing equal access to the job market would be undermined, the court reasoned, by applying a narrow definition of "employer:"

> To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

*Id.* at 1341. The *Sibley* court noted that Congress provided remedies for "any individual" who suffered employment discrimi-

**2.** Most of the cases addressing the scope of the term "employer" in anti-discrimination law have arisen in Title VII and AREA cases. As the First Circuit has explained, however, the analysis of the term under the ADA may draw upon law concerning those other statutes. *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.*, 37 F.3d 12, 16 (1st Cir.1994), noted that the definition of "employer" in the ADA is materially identical to that in Title VII. *Compare* 42 U.S.C. § 2000e(b) (Title VII) *with* 42 U.S.C. § 12111(5)(A)(ADA). The First Circuit also noted that the EEOC's Interpretive Guidance on Title I of the ADA states that "employer" should be given the same meaning under the ADA that it has under Title VII. *See Carparts*, 37 F.3d at 16 (citing 29 C.F.R. § 1630, App.). Finally, the *Carparts* court pointed out that the ADA itself provides that the " 'powers, remedies and procedures' of Title VII shall apply to claims of discrimination under Title I of the ADA." *Id.* (quoting 42 U.S.C. § 12117(a)). *See also United States Equal Employment Opportunity Comm'n v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279–80 (7th Cir.1995) (noting that the definitions of "employer" in the ADEA mirrors that in the ADA and Title VII and that "[c]ourts routinely apply arguments regarding individual liability to all three statutes interchangeably"). *Cf. Sarno v. Douglas–Elliman Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999) (holding that it is "appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation under the ADA" given the provisions' similarity and the use of the same burden-shifting approach in analyzing claims under the two statutes).

nation, rather than limiting the statute's coverage to employees and applicants, and found that choice to be a "strong indication that the proscriptions contemplated by [Title VII] reach beyond the immediate employment relationship." *Id.* Thus, because the hospital "control[led] the premises upon which [appellee's] services were to be rendered, including appellee's access to the patient for purposes of the initiation of . . . employment," it could be considered the nurse's employer for Title VII purposes notwithstanding the absence of a direct employment relationship. *Id.* at 1342.

The Second Circuit has adopted the indirect employment rationale of *Sibley*. *Spirt v. Teachers Insurance and Annuity Assoc.*, 691 F.2d 1054 (2d Cir.1982), *judgment vacated on other grounds*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), stated that

> it is generally recognized that the term "employer," as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an "employer" of an aggrieved individual as that term has generally been defined at common law.

*Spirt*, 691 F.2d at 1063 (internal quotation marks omitted). Diana Spirt was a professor at Long Island University who was required as a term of her contract to participate in the retirement benefits program run by the defendants. Those benefits included an annuity that, due to women's longer average lifespan, paid a lower monthly benefit to women than to men. The Second Circuit concluded that because the defendants were so intertwined with the university, they could be considered Spirt's employers for Title VII purposes. *See id.* The *Spirt* decision thus adopted *Sibley*'s concept of "indirect liability for an employer's interference with an individu-

al's employment with third parties." *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 188 (4th Cir.1998).[3] Where an entity meets the statutory requirements of an "employer" and exerts significant control over an individual's access to or terms and conditions of employment with a third party, that entity can be considered an "employer" despite the absence of a common-law employment relationship with the individual.

### B. Applying the Interference Theory to the District

■ The contract between the District and Amboy gave the District sufficient control over Bacalakis's employment to deem it his employer under *Spirt*. That contract provides:

> The names of all prospective Drivers, whom the Contractor [Amboy] expects may operate a Bus with student passengers under the terms of this contract, must be submitted to the District by the Contractor for District approval. The District shall withhold or withdraw approval of any Driver who does not comply with any provision of this contract. The District may, in the prudent exercise of its sound discretion, withhold or withdraw approval for any other reason. At *no* time shall any Bus carrying student passengers under this contract be operated other than by an approved Driver.

McCarthy Dep.Exh. 1 at 21 (emphasis in original). For each driver, Amboy was required to provide the District with medical reports, letters of reference, a list of accidents occurring within the previous three years from Amboy's insurer, a driver abstract from the Motor Vehicle Bureau, and certification of completion of a forty-six hour driver training course. *See id.* at 17–20. The District could require that drivers be fingerprinted by the police and that the prints be checked. *See id.* at 18.

---

**3.** The Second Circuit is not alone in so doing. "Every Court of Appeals to consider this issue has followed the lead of the District of Colum-

bia Circuit in allowing such a claim." *Bender*, 159 F.3d at 188.

The District took these responsibilities seriously. Eileen McCarthy, formerly the Transportation Coordinator of the District, testified at deposition that she read every line of every page of each driver's application. *See* McCarthy Dep. 34. After McCarthy reviewed the applications, she sent them to the Assistant Superintendent for Business Affairs for his review before the Superintendent finally approved them. *See id.* at 38–39. The District's review of the applications was not a mere formality; McCarthy testified that the District has in fact withheld approval of Amboy drivers, and, in one case, withdrawn approval of a driver. *See id.* at 36–37.

McCarthy's testimony and the contract itself provide uncontroverted evidence that the District had a veto over the employment of drivers by Amboy on routes covered by the contract. For purposes of hiring drivers to transport the District's schoolchildren, Amboy and the District are "so closely intertwined" as to render the District an employer of the drivers for the purposes of the ADA. *Spirt*, 691 F.2d at 1063. *See Hill v. New York City Bd. of Educ.*, 808 F.Supp. 141, 148 (E.D.N.Y. 1992) (Glasser, J.) (determining that school board was Title VII employer of Amboy's drivers under *Spirt*); *Equal Employment Opportunity Comm'n v. KDM School Bus Co.*, 612 F.Supp. 369, 373 (S.D.N.Y.1985) (concluding that school district was ADEA employer of bus company's drivers, citing *Sibley*).[4]

The District contends that it did not have a veto over Bacalakis's employment with Amboy because Amboy could have employed him under its contracts with other school districts. *See* District's Reply Mem. of Law 8. By contrast, the District points out, the *Hill* decision mentioned that the New York City contract was Amboy's only contract during the period relevant to that case. *See Hill*, 808 F.Supp. at 148.

The fact that Bacalakis theoretically could have worked for Amboy without working on the District contract does not, however, remove the potential sting of the District's action. As explained in *Morrison v. American Bd. of Psychiatry and Neurology, Inc.*, 908 F.Supp. 582, 587 (N.D.Ill.1996), "total foreclosure from future employment opportunities is not necessary under the *Sibley* approach." In *Gomez v. Alexian Bros. Hospital of San Jose*, 698 F.2d 1019 (9th Cir.1983), the defendant hospital allegedly rejected on racial grounds a contract with AES, a corporation that employed the plaintiff, by which AES would have operated the hospital's emergency room. *See id.* at 1020. Gomez would have been the full-time director of the emergency room under the proposal. *See id.* The court rejected the argument that Gomez had no claim under *Sibley* because he did not lose his job at AES: "The fact that plaintiff continues as an employee of AES does not mean the employment relationship between AES and plaintiff has not been interfered with. The conditions of plaintiff's employment are different than they would have been had he not been discriminated against." *Id.* at 1021. Similarly, in *Amarnare*, Merrill Lynch was considered the employer of a temporary employee. *See Amarnare*, 611 F.Supp. at 349. The firm terminated the plaintiff's assignment, but she continued to be employed by the temp agency for which she worked. *See id. Cf. Moland v. Bil–Mar Foods*, 994 F.Supp. 1061, 1073 (N.D.Iowa 1998) (applying indirect employment theory where plaintiff was transferred by employer from job in defen-

4. In its discussion of the interference theory, the District only cites to one case, *People v. Holiday Inns, Inc.*, 1993 WL 30933 (W.D.N.Y. Jan.28, 1993). That case, which rejected *Sibley* liability, is inapposite because the defendant had absolutely no control over employment decisions of the third party. *See id.* at *10. Similarly, *Kern v. City of Rochester*, 93 F.3d 38, 45 (2d Cir.1996), distinguished *Spirt* because the defendant in *Kern* had no connection to the plaintiff's employment with the third party. By contrast, the District had, by the testimony of its own employee and the plain language of the contract, significant control over the hiring and firing of bus drivers of the District's students.

dant's facility after being harassed and no other position was made available); *Diana v. Schlosser*, 20 F.Supp.2d 348, 350 (D.Conn.1998) (applying indirect employment theory where third-party employer reassigned plaintiff from defendant's radio broadcast after she was harassed and plaintiff suffered no loss of pay but less on-air time). Indeed, the plaintiff in *Sibley* itself was still able to work for male patients.

The fact that Bacalakis might still have worked for Amboy in a different capacity does not counteract the District's control over access to the particular employment opportunity at issue here—driving a school bus on routes within the Three Village Central School District. *See Sibley*, 488 F.2d. at 1342 (holding that remedies may be available against defendants "who control access to such employment and who deny such access by reference to invidious criteria."). As *Sibley* itself explained:

> To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

*Id.* at 1341. It is no defense to direct employment discrimination to argue that the victim could have found work someplace else. Similarly, the District is afforded no relief by the fact that Bacalakis could have found work someplace else, even within Amboy. The District is an employer and consequently a covered entity under the ADA.

### C. The State Defendants and Preemption of the State Regulations

■ DMV and SED assert that this case does not fit within the *Sibley* and *Spirt* line as to them for two reasons. First, they argue that the DMV and SED regulations were invalidated by the ADA, and therefore could not have interfered with the employment relationship between Bacalakis and Amboy and the District. The State Defendants are correct, of course, that the Supremacy Clause gives the ADA precedence over conflicting state regulations. The court has difficulty accepting the proposition, however, that the very illegality of the state's regulations innoculate it against liability. The two agencies are backed by the coercive power of the state, and private employers and local school districts may understandably think twice before challenging that power, even if they might ultimately expect to prevail. While it may be true that, in the words of Chief Judge Posner in a similar case, "a competently counseled school district would have told the state to go fly a kite," *Equal Employment Opportunity Comm'n v. State of Illinois*, 69 F.3d 167, 170 (7th Cir.1995) (examining whether the state was a local public teacher's employer under the ADEA by virtue of its mandatory retirement law), requiring a third party to engage in costly litigation in order to engage the employee's services would seem to constitute interference. There is evidence that the state agencies in this case, unlike in Judge Posner's, indicated an intention to enforce their regulations. *See, e.g.,* McCarthy Dep. 60–62 (describing SED employee's statement that Bacalakis could not receive exemption or exception from SED regulation). The fact that the state has since conceded that its regulations violated the ADA is not sufficient to escape liability.

### D. The State Defendants and the Police Power Exception

■ The State Defendants argue in the alternative that their interference in Bacalakis's employment prospects does not bring them under the ADA's definition of "employer" because the agencies were acting in their regulatory capacity and therefore *Spirt* and *Sibley* do not apply. A number of courts have found that "where a

governmental organization is exercising its police power, the control it exerts over a person's access to the job market does not render the governmental organization an 'employer' or 'employment agency' within the meaning of Title VII." *George v. New Jersey Board of Veterinary Medical Examiners*, 635 F.Supp. 953, 955 (D.N.J. 1985), *aff'd*, 794 F.2d 113 (3d Cir.1986). The Second Circuit has not ruled on this question, however, and the Plaintiff argues that *Spirt*, by its broad language and the cases it cited, implicitly rejected the police power exception. The court disagrees and finds that a governmental agency exercising its police power cannot be an employer under the ADA.

The police power exception has arisen primarily in the context of licensing. The withholding of a license dramatically affects an individual's employment prospects, but has not rendered the licensing body an employer of the would-be licensee in most cases. *See, e.g., Association of Mexican–American Educators v. State of California*, 195 F.3d 465, 483 (9th Cir. 1999) [hereinafter *"AMAE"*]; *EEOC v. Illinois*, 69 F.3d at 170; *George*, 794 F.2d at 114; *Woodard v. Virginia Board of Bar Examiners*, 598 F.2d 1345, 1346 (4th Cir. 1979); *Tyler v. Vickery*, 517 F.2d 1089, 1096 (5th Cir.1975); *Equal Employment Opportunity Comm'n v. Waterfront Comm'n of New York Harbor*, 665 F.Supp. 197, 200 (S.D.N.Y.1987); *National Organization of Women v. Waterfront Comm'n of New York Harbor*, 468 F.Supp. 317, 320 (S.D.N.Y.1979) [hereinafter *"NOW"*]; *Lavender–Cabellero v. Dep't of Consumer Affairs*, 458 F.Supp. 213, 215 (S.D.N.Y.1978). *But see United States Equal Employment Opportunity Comm'n v. City of Evanston*, 854 F.Supp. 534, 538 (N.D.Ill.1994) (finding state to be employer under ADEA because state law required city to maintain pension for firefighters and to use age-based criterion limiting participation); *Morrison v. American Board of Psychiatry and Neurology, Inc.*, 908 F.Supp. 582, 585 n. 11 (N.D.Ill.1996) (opining in dicta that "it is doubtful whether the licensing exception can survive in intellectual harmony with the *Sibley* theory"); 1 Lex K. Larson, *Employment Discrimination* § 4.01[2] at 4–8 (2d ed.1999) (stating that "almost none" of the decisions recognizing an exception for licensing bodies "provide even a remotely satisfying reason why *Sibley* should not apply").

Some courts have concluded that a common-sense understanding of the "employer" definition does not suggest a Congressional intent to include licensing bodies. *See Haddock v. Board of Dental Examiners*, 777 F.2d 462, 464 (9th Cir.1985) ("A simple reading of this definition suffices to demonstrate that it is not intended to apply to the kind of licensing activity in which the Board engages."); *Tyler*, 517 F.2d at 1096. The court in *NOW* also concluded from the language employed by Congress that it intended that licensing would not be covered: "We cannot believe that a Congress that had before it such a meticulous enumeration of the categories of entities covered by the Act would have left to speculation and conjecture any desire to subject to federal regulation city and state licensing activities of which it was obviously aware." *NOW*, 468 F.Supp. at 321 (footnote omitted). *Accord Lavender–Cabellero*, 458 F.Supp. at 215 ("To say that Congress was unaware of potential employment-related problems resulting from state and city licensing would be to deny reality."). The legislative history's silence concerning licensing bodies supports the view that they were not intended to fall under Title VII when Congress made it applicable to state and local governments. "While supporters of the bill, in committee reports and debates, repeatedly referred to the approximately ten million nonfederal government jobs that would be affected by the expanded coverage, the history is barren of any reference to either state licensing agencies or the many persons licensed by them." *Haddock*, 777 F.2d at 464.

This reasoning is reinforced by federalism concerns. When regulating pursuant to its police power, but not when acting in its proprietary capacity, the state is acting as a sovereign. This distinction is relevant. *Lavender–Cabellero* explained that a public or private employer "has the limited interest in insuring that the individual hired is capable of performing the required tasks." *Lavender–Cabellero,* 458 F.Supp. at 214. A licensing agency on the other hand, performs "a separate, and presumably necessary public, as opposed to private function, separate and apart from employment itself." *Id.* at 215. *See also George,* 635 F.Supp. at 955. Federal courts are traditionally reluctant to impinge on the authority of states to pursue such public interests absent a clear Congressional intent to do so. "Congress should make its intention 'clear and manifest' if it intends to pre-empt the historic powers of the States...." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Holding the state liable for its regulations, even when the regulations in question have been pre-empted by federal law, diminishes the state's authority, and the Supreme Court disfavors " 'inroads by implication on state authority.' " *NOW,* 468 F.Supp. at 321 (noting that) (quoting *Palmer v. Massachusetts,* 308 U.S. 79, 84, 60 S.Ct. 34, 37, 84 L.Ed. 93 (1939)). *Accord Lavender–Cabellero,* 458 F.Supp. at 215 ("To impose the Federal oversight of state regulation of such interests required by Title VII, the Congressional mandate must be more explicit."). Without Congressional manifestation of an intent to sanction states for actions taken in their sovereign capacity, application of indirect *Sibley* liability is not warranted.[5]

The Plaintiff contends that, despite these rationales, there is reason to believe that the Second Circuit implicitly rejected the police power exception in *Spirt.* According to the Plaintiff, *Spirt* cited two cases that rejected the police power exception, thus implying that the Second Circuit too rejected the exception. The two cases discussed by the Plaintiff, however, *Vanguard Justice Society, Inc. v. Hughes,* 471 F.Supp. 670 (D.Md.1979), and *Puntolillo v. New Hampshire Racing Comm'n,* 375 F.Supp. 1089 (D.N.H.1974), do not clearly involve state bodies acting pursuant to the police power. *Spirt's* citation to them therefore does not indicate any opinion of the police power exception.

*Vanguard* held that the City of Baltimore was an employer of police personnel "[d]espite its concededly limited role in the hiring process...." *Vanguard,* 471 F.Supp. at 696. The Police Commissioner had nearly plenary authority over the Baltimore City Police Department, including personnel decisions. *See id.* at 690–91. An exception was that the Civil Service Commission of the city was responsible for developing and administering examinations necessary "to test fairly the relative capacity and fitness of the candidates to discharge the duties of the position for which they are seeking to qualify." *Id.* at 692 (quoting Baltimore City Public Local Laws § 16–10). Because all police in Baltimore work for the city, the case presents a situation near the proprietary-regulatory line. In this case, however, it is significant that the test was not, like a typical licensing test, intended to establish a minimum

---

5. Judge Shadur has argued that "it is certainly inconsistent to conclude that because the function of a licensing board is to impose restrictions for the public good it should not be held liable for doing so in a discriminatory manner." *Morrison,* 908 F.Supp. at 585 n. 11. The police power exception is, in the opinion of this court, better understood as resting on general notions of federalism than on a balancing of competing public goods. Indeed, the public good derived from a state's licensing activities or safety regulations can, as Judge Shadur suggests, be achieved consistently with the public good of combating discrimination; the latter need not be sacrificed in pursuit of the former. It is respect for states' sovereignty generally, not deference to the particular policy goals that the states may be discriminatorily enforcing, that justifies the police power exception.

level of competency. Instead, the Civil Service Commission was to cull the best candidates from the pool by testing the "relative capacity and fitness of the candidates" for the job. *Id.* Given the nature of that test, its administration can fairly be described as a proprietary function rather than a regulatory function.

The other case discussed in depth by the Plaintiff is *Puntolillo.* That case challenged the New Hampshire Racing Commission's denial of stall space at a racetrack it owned and denial of a license to race at that track. *See Puntolillo,* 375 F.Supp. at 1090. Although the Commission was a state agency, it was acting as owner of the racetrack. The "license" it denied was not apparently a general license to race in New Hampshire, but permission to race at the particular track. *See id.* at 1091. Moreover, it was applying its own rules, as administrator of the track, not those imposed by a policy-making body. *Cf. AMAE,* 195 F.3d at 484 ("we would consider the fact that this requirement was mandated by the Legislature (rather than by an administrator responsible for managing the positions at issue) as providing additional evidence that the State is acting in its sovereign capacity rather than its proprietary capacity") (parentheses in original). Nothing in the opinion suggests that the Commission was acting in a regulatory capacity other than use of the term "license."

Given that neither *Vanguard* nor *Puntolillo* squarely holds that a regulatory or licensing agency falls under the definition of "employer," *Spirt's* citation to them is not probative of an intention to reject the police power exception.[6] Indeed, the one court in the circuit that has considered the issue since *Spirt* has concluded that *Spirt* did not require application of ADEA to licensing bodies. In *EEOC v. Waterfront Comm'n,* 665 F.Supp. at 200, the plaintiff

argued that the Waterfront Commission, which licensed pier guards, was an employer under *Spirt.* Judge Duffy distinguished *Spirt,* applying the police power exception: "The crucial distinction between these cases and the instant case is that neither *Sibley* nor *Spirt* involved a state agency which had licensing authority pursuant to an exercise of the states' police power." *Id.* This court agrees, and thus concludes that a state agency cannot be considered an employer within the ADA when it is acting pursuant to its police power.

*E. Applicability of the Police Power Exception to the State Defendants*

■ The Plaintiff argues that, even if the police power exception is valid, it does not apply in this case because the State Defendants were actively involved in the hiring decision, not merely rulemakers. The police power exception requires courts to draw a line between state action in a proprietary role and in a regulatory role. *See AMAE,* 195 F.3d at 483 ("we think that the critical issue is whether the State is exercising its police powers or its proprietary powers"); *EEOC v. Illinois,* 69 F.3d at 170; *EEOC v. Waterfront Comm'n,* 665 F.Supp. at 200; *George,* 635 F.Supp. at 955; *NOW,* 468 F.Supp. at 320; *Lavender–Cabellero,* 458 F.Supp. at 215. When the state is acting in its proprietary role as an employer, it is subject to Title VII, the ADA, and the ADEA. When acting as a regulator, however, in exercise of its police powers, it is accorded more deference.

Drawing the line between proprietary and regulatory action can admittedly be difficult. The dissent in *AMAE* challenged the very viability of the distinction between proprietary and regulatory action. *See AMAE,* 195 F.3d at 496 (Boochever, J., dissenting). The majority, however, countered that the line was both well-es-

---

6. It is also worth noting that the citations to *Vanguard* and *Puntolillo* were contained within a string citation to *Sibley* and other cases in support of the general concept of indirect employment. *Spirt* itself did not implicate the police power exception, explicitly or implicitly.

tablished and discernable. *See id.* at 483 n. 19. The *AMAE* majority then went on to suggest how to make the determination. It considered two non-dispositive factors in determining that a qualifying test required of public school teachers but not of teachers in private schools was instituted as an exercise of police power rather than as a proprietary act. First, the fact that the state's requirement extended beyond its own employees to affect similarly employed individuals in other public agencies, local school districts, suggested that the state was acting under its police power. *See id.* at 484. Second, the court considered that the requirement was imposed by the legislature as opposed to "an administrator responsible for managing the positions at issue." *Id.* The Ninth Circuit concluded that those factors "tip the balance in favor of the Defendants." *Id.*

██ Applying the factors suggested by the Ninth Circuit, the State Defendants' regulations fall on the regulatory side of the line. DMV's regulation applied to all bus drivers in the state, whether employed by the state, its subdivisions, or private companies. SED's regulation likewise applied to any school bus driver, regardless of that person's employer. Looking at the second prong of the *AMAE* analysis, although the content of the regulations in question was not mandated by the legislature, both agencies acted pursuant to rule-making authority conferred by statute. Moreover, neither the Commissioner of Motor Vehicles nor the Commissioner of Education is responsible for managing school bus drivers. Their functions are to ensure that drivers meet safety standards, not to assess or monitor performance.

The Plaintiff nevertheless argues that the State Defendants' involvement in the hiring decisions concerning school bus drivers was so great as to render their actions proprietary. As neither agency directly employs school bus drivers or even contracts with bus companies, the State Defendants' actions could be proprietary only if there were a sufficient level of interrelationship between each agency and the District to consider each a "single employer" with the District. A parent company will be considered an employer of its subsidiary's employees for Title VII purposes only when they are determined to represent a single, integrated enterprise.[7] *See Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2d Cir.1995). *Cook* held that a parent company will thus be held liable under Title VII only when there is evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *See id.* at 1240 (citing *Garcia v. Elf Atochem North America,* 28 F.3d 446, 450 (5th Cir.1994)). Of these, the second is the most important. *See id.* at 1241. The test ultimately depends, however, on "whether 'all the circumstances of the case' tend to show the absence of an arm's length relationship between two entities." *Rivera v. Puerto Rican Home Attendants Services, Inc.,* 922 F.Supp. 943, 949 (S.D.N.Y.1996) (quoting *Lihli Fashions Corp. v. N.L.R.B.,* 80 F.3d 743, 747 (2d Cir.1996)).[8]

---

**7.** The single employer analysis is typically invoked when assessing a parent company's liability for the actions of its subsidiary towards the subsidiary's own employees or potential employees. In this case, the State Defendants' liability as single employers with the District would be premised on the District's interference and subsequent liability under *Spirt.*

**8.** Although the test is designed for the private sector and does not translate perfectly to public entities, the relationship between the state and its school districts is analogous to that of a parent company and its subsidiary. *See AMAE,* 195 F.3d at 482. The first three elements of the *Cook* test are applicable in the public setting and the fourth can be analogized to budgetary interrelatedness. As the court in *EEOC v. Illinois* wrote in considering whether the state could be considered an employer of a school district's employees: "The principle that animates the [single employer] doctrine is not limited to the technical relation of parent to subsidiary corporation (the 'integrated enterprise')." *EEOC v. Illinois,* 69 F.3d at 171.

In this case, none of the *Cook* factors points towards liability for the State Defendants. The Plaintiff explains in some detail the involvement of SED and DMV in the employment of school bus drivers in New York. DMV has regulations that govern the hiring process of all bus drivers by common carriers, including required medical exams and various background checks. *See* Plaintiff's Mem. of Law 3. SED has promulgated similar regulations governing qualifications of school bus drivers. *See id.* at 4. In addition, SED is required to approve all contracts between school districts and common carriers for provision of busing services for students. *See id.* at 4–5.

The agencies' promulgation of these minimum standards for bus drivers does not amount to centralized control of labor relations. The individual in the District responsible for approving bus drivers was not an employee of or in any way answerable to either agency. The fact that SED approves contracts between districts and bus companies does not alter this conclusion, as that provision does not give SED input into the employment decisions concerning specific drivers. Although they set minimum qualifications and procedural requirements, the agencies have no authority to hire or fire drivers, to supervise drivers' work or the conditions of their employment, to determine their rate or method of pay, or to maintain records of their employment. *See Kern v. City of Rochester,* 93 F.3d 38, 45 (2d Cir.1996). These facts contrast sharply with those in *Cook,* where applications for employment with the subsidiary were directed to the parent company, personnel status reports were approved by the parent company, and the two companies maintained a common management structure. *See Cook,* 69 F.3d at 1241. There is no evidence that other functions are mingled between the District and either State Defendant or that significant budgetary overlap exists. None of the *Cook* factors, or any other circumstance in this case, suggests that the relationship of the District and the State Defendants was other than arm's length. *See EEOC v. Illinois,* 69 F.3d at 171 (concluding that state was not employer of school teachers despite extensive regulation of working conditions since powers to hire and fire remained in the school district). That the agencies' regulations are detailed in this field does not so intertwine them in the personnel decisions of districts to render them employers under the ADA. They therefore were not acting in a proprietary manner in promulgating the regulations at issue.

The Plaintiff also recounts actions taken by each agency that, it argues, tend to show the State Defendants' control over the specific hiring decision concerning Bacalakis. According to the deposition testimony of Eileen McCarthy, the District's transportation coordinator, she called SED to ask if there was any way that Bacalakis could work despite his amputation. *See* McCarthy Dep. 59 The response given her by SED's transportation supervisor was a "quite heated" refusal to make any exception. *Id.* at 61. The Assistant Director of DMV's Bus Driver Certification Unit replied to a letter from Bacalakis seeking assistance in returning to work by informing him that the regulations would not permit him to drive a bus in New York. *See* Cohen Aff.Exh. E. The Plaintiff also references other, similar representations from the two agencies. *See* Plaintiff's Reply Mem. of Law 7–8. Thus, argues the Plaintiff, the State Defendants "were involved in the decision to deny Mr. Bacalakis employment." Plaintiff's Mem. of Law 28.

The import of the police power exception is that a state actor's influence over an individual's employment prospects does not necessarily cause that actor to be considered the individual's employer. Although each agency indicated that Bacalakis could not be re-hired under their regulations, their statements simply amounted to the agencies' erroneous view that their regulations were in force. The

threat of enforcement of an agency's regulations, enacted in exercise of the state's police power, will not make the state's actions proprietary. To hold the state liable for enforcement of its regulations would vitiate the police power exception. It may be possible that a state agency's involvement in a given case could be so proactive and intense as to exceed enforcement of its regulations, but the State Defendants' involvement in Bacalakis's case was not.

The State Defendants' actions in this case were taken in exercise of the state's police power. The agencies enacted regulations and, when asked, indicated an intention to stand by them. That the regulatory scheme may have been detailed does not change the basic nature of the agencies' involvement. Because DMV's and SED's interference in Bacalakis's employment prospects were entirely the result of their regulatory undertakings, they cannot be considered "employers" within the meaning of Title I of the ADA.[9]

### III. Discrimination by the District

The ADA provides in relevant part that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring ... of employees." 42 U.S.C. § 12112(a). The District contends that, even if it is a covered entity with respect to Amboy's drivers, it took no adverse action against Bacalakis. This assertion is based on the fact that Bacalakis never formally applied for reinstatement and, thus, the District was never in a position to approve or reject him as a driver.

While it is true that Amboy did not submit an application packet for Bacalakis to the District for approval, the absence of a formal application is not dispositive. When an employer manifests its intention to discriminate, a plaintiff will not be penalized for failing to subject himself to that discrimination. "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 365–66, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1977). The logic is no less applicable in the *Sibley* context. If Amboy refused to rehire Bacalakis because it knew that the District would reject an amputee, the District would have interfered in the employment relationship on improper grounds.

This case is not, as the District argues, *see* District's Mem. of Law 21, analogous to *EEOC v. Illinois*. There, the Seventh Circuit refused to consider a mandatory retirement regulation to be a mandate to fire because the state had not indicated any intention to enforce the regulation after the ADEA preempted it. *See EEOC v. Illinois*, 69 F.3d at 169–70. In this case, the District made clear to Bacalakis that it considered the contract term in force. After McCarthy, the District's Transportation Coordinator, was told by SED that no exception to the rule was possible, she told Bacalakis, " 'There is no way I can help you.' " Bacalakis Dep. 24. Had Amboy submitted an application for Bacalakis,

---

**9.** The Plaintiff argues that the State Defendants can be held liable even if not Bacalakis's employer because the action was brought under the "pattern and practice" provision of Title VII as incorporated into the ADA. *See* Plaintiff's Reply Mem. of Law 15–16 (citing 42 U.S.C. § 12117 and 42 U.S.C. § 2000e–6). For this proposition, the Plaintiff cites *United States v. Board of Educ.*, 911 F.2d 882, 892 (3d Cir.1990). That case, however, further explains that § 2000e–6 is "a provision allowing the Attorney General to seek injunctions against any action by any person that would result in *future violations* of Title VII." *Id.* (emphasis added). The Plaintiff acknowledges that the State Defendants have amended their regulations and that both are now in compliance with the ADA. *See* Plaintiff's Mem. of Law 16. Since there is no risk of future violations and the Plaintiff does not presently seek injunctive relief, there are not grounds for a pattern and practice judgment against the State Defendants.

there is every reason to believe that the District would have rejected it.

■ Nevertheless, there is not sufficient evidence before the court to allow a reasonable jury to find a causal connection between the District's actions and the decision not to hire Bacalakis. Bacalakis first approached LoGelfo about returning to work in May 1993. LoGelfo told Bacalakis "that New York State regulations at this time would not qualify him as a school bus driver." LoGelfo Dep. 30. LoGelfo's deposition testimony indicates that he viewed the DMV regulation, promulgated pursuant to Article 19A of the New York Vehicle and Traffic Law, as the obstacle to rehiring Bacalakis:

Q. In what way was Mr. Bacalakis not qualified?

A. Under the State regulations he was not qualified to transport school children in New York State.

Q. What provision of the State regulations are you referring to?

A. Article 19A.

Q. What does 19A say specifically about Mr. Bacalakis that made him unqualified?

A. He was missing a limb which was, you know, stated flatly in the Article. He was not qualified to operate a school bus in New York State.

*Id.* at 35. His testimony suggests that LoGelfo was concerned about the direct application of the DMV regulation, not about an anticipated rejection of Bacalakis by the District. The DMV regulation imposed a duty on Amboy as a common carrier not to employ Bacalakis as a bus driver, regardless of the District's position on his qualifications. *See* N.Y.Veh. & Traf.Law § 509–d.

At no point in his testimony did LoGelfo suggest that he was motivated by his understanding of the District's position. After informing Bacalakis that the regulations barred him from driving, LoGelfo referred Bacalakis to the Bus Driver Certification Unit of DMV, not to the District. *See id.* at 37; Bacalakis Dep. 15. LoGelfo

turned down Bacalakis's requests for reinstatement three times before suggesting he talk to Eileen McCarthy, the District's Transportation Coordinator. When he did finally refer Bacalakis to McCarthy, he did so to try to console Bacalakis, not, according to his testimony, because he thought the District could allow Bacalakis to drive. LoGelfo testified that his conversation with McCarthy consisted of the following: "Mainly how upset I was with the situation and more or less our hands were tied. There really wasn't anything we could do because he really wasn't qualified to drive a school bus, and just to direct him into channels of, you know, the State agency to be in contact with." LoGelfo Dep. 40. McCarthy's version of their conversation was similar:

Q. What did Mr. LoGelfo say to you?

A. He said that Ted was very upset and very depressed, and could I just give him a cup of coffee and talk to him.

Q. Did Mr. LoGelfo tell you why Mr. Bacalakis was very upset or depressed?

A. He said that he had lost the limb and therefore he couldn't drive a bus, and this had him very depressed.

Q. Did Mr. LoGelfo say to you that Mr. Bacalakis had requested to be reinstated in his position as a bus driver?

A. I don't believe so. We talked more about Ted's depression.

McCarthy Dep. 50. No testimony of LoGelfo, McCarthy, or Bacalakis suggests that LoGelfo believed that McCarthy's meeting with Bacalakis could result in authorization for Bacalakis to drive a school bus. Put another way, there is nothing to suggest that District approval of Bacalakis would have persuaded Amboy to rehire him in the face of the DMV regulation.

Given LoGelfo's testimony that his decision not to rehire Bacalakis was based on the DMV regulation not the contract, there is insufficient evidence of a causal link between District actions and Amboy's failure to rehire Bacalakis to allow a reasonable jury to conclude that the District discriminated. That the District would have discriminated given the chance is immate-

rial; the ADA bars discriminatory action not discriminatory intent. Summary judgment in favor of the District is therefore warranted.

## CONCLUSION

For the reasons explained herein, summary judgment is granted in favor of all defendants. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.